In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2012

DAVID L. LEWIS,

*Plaintiff-Appellant*,

*v.*

LARRY MILLS, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 2:09-cv-02090-MPM—**Michael P. McCuskey**, *Judge.*

ARGUED NOVEMBER 29, 2011—DECIDED APRIL 20, 2012

Before POSNER and KANNE, *Circuit Judges,* and PRATT, *District Judge.*\*

PRATT, *District Judge.* David L. Lewis is a former part-time police officer for the Village of Belgium, Illinois—a town of just over 400 people. On January 6, 2010, Lewis

\* The Honorable Tanya Walton Pratt, District Judge for the United States District Court for the Southern District of Indiana, is sitting by designation.

filed a one-count Amended Complaint arising under 42 U.S.C. §§ 1983 and 1988 against four defendants who allegedly participated in a conspiracy to prosecute him for various sexual offenses to retaliate against him for cooperating with an FBI investigation. These four defendants—a truly unique web of characters—consist of: (1) Larry Mills, the First Assistant State's Attorney for Vermilion County, Illinois; (2) Todd Damilano, a Deputy Sheriff/Investigator for the Vermilion County Sheriff's Department (the "Sheriff's Department"); (3) Scott Corrie, the former owner of a now-defunct strip club in Belgium, Illinois, called the Playpen Gentlemen's Club (the "Playpen"); and (4) Clint Gray, who is Lewis's brother, Corrie's friend, and an occasional patron of the Playpen.

Lewis paints a tawdry tale involving drugs, sex, power, corruption, and revenge, all culminating in a violation of his First Amendment constitutional rights. The district court observed that although there was "plenty of smoke" in this case, there was no "evidentiary fire," or even an "evidentiary matchstick." Citing this lack of evidentiary support for Lewis's claims, the district court granted summary judgment for all four defendants. Lewis has now appealed, and we affirm.

## I. Background

Lewis worked as a part-time police officer in Belgium, Illinois from October 2003 until February 2007. Lewis apparently had an unremarkable record until

March 2006, when numerous women—mostly dancers at the Playpen— began accusing him of a wide variety of inappropriate sexual conduct.

Specifically, Lewis's saga began around 3:10 a.m. on March 17, 2006. At that time, Lewis—on duty and in full police uniform—pulled over Danielle Perry, a Playpen dancer. Soon thereafter, Perry drove off, leaving Lewis alone alongside his Village of Belgium squad car. Roughly 20 hours later, at 10:45 p.m., Perry reported to the Sheriff's Department that, during the traffic stop, Lewis grabbed her, forced her to kiss him, and put his hands down her pants.

The Sheriff's Department Captain, Rod Kaag, launched an investigation of Lewis's alleged conduct. On March 22, 2006, Perry gave a recorded account of what transpired. On March 23, 2006, Kaag procured a grand jury subpoena to obtain Perry's phone records to see if the records were consistent with her version of events. That same day, Kaag advised Mills that the Sheriff's Department was launching an investigation against Lewis based on Perry's report. Notably, Kaag "did not ask Mills for guidance, direction or assistance in the investigation." Moreover, Kaag does "not recall having any other discussions with Mills in 2006 about Lewis" and "did not ask Mills to take any prosecutorial action in 2006 *vis a vis* Lewis."

In April 2006, two more Playpen dancers reported allegations of a sexual nature involving Lewis. Lacrisha Carrigan informed Kaag that, one year earlier, Lewis, while on duty, showed her pictures of his genitalia next

to a beer bottle. Rebecca Lee told Investigator Damilano—
who was working under the direction and supervision
of Kaag—that she gave Lewis oral sex to avoid a traffic
ticket. Damilano supplied Kaag with a copy of Lee's
report. Kaag did not immediately pursue charges against
Lewis because he had concerns that these allegations,
standing alone, "would not be sufficient to convict
Officer Lewis."

It is perhaps unsurprising that an establishment like
the Playpen—which has since closed—was a haven for
trouble. Indeed, the "secondary effects" of strip clubs
are well-established. *See, e.g., Fantasy Ranch, Inc. v. City
of Arlington*, 459 F.3d 546, 559 (5th Cir. 2006). Presumably,
that is why, in January 2006, the Belgium Police Chief
Dale Ghibaudy instructed his officers to avoid the
Playpen unless they were responding to a call. However,
in Ghibaudy's view, this admonition had little deterrent
effect on Lewis. Ghibaudy testified in his deposition
that he believed Lewis repeatedly and grossly violated
this directive.

On January 19, 2007, Audrey White—who worked
for Clint Gray at his restaurant, Fat Boy Subs—lodged
a complaint with Ghibaudy about an incident involving
Lewis that occurred on December 23 and 24, 2006. She
then followed this up with a recorded statement on
January 22, 2007. Specifically, White alleged that, hours
after running into Lewis at the Playpen on the night of
December 23, 2006, Lewis arrived at her home in full
uniform, invited her into his squad car, drove her to
a secluded area, and tried to kiss her.

In February and March 2007, Damilano interviewed four more women who claimed that Lewis had sexually victimized them. Three were Playpen employees (Cheryl Forshier, Amy Dow, and Jennifer Garrett, who also happens to be Lewis's sister-in-law), and one was a Steak n' Shake employee (Ashley Grider). Following this spate of allegations, Kaag became "convinced that probable cause existed to believe that Lewis had victimized several women and abused his police position with the Village of Belgium." Therefore, he and Damilano finally turned over the results of the investigation to Mills.

But, notably, in the meantime, Mills had become the subject of a separate investigation involving allegations of unseemly conduct. Specifically, before 2006, the FBI began investigating Mills on suspicion that he had provided favorable deals to criminal defendants in exchange for drugs and other favors. On December 13, 2006, an FBI Special Agent and an Illinois State Police Investigator interviewed Lewis and inquired about Mills. Lewis responded that he had no firsthand knowledge of any drug trafficking or drug use by Mills. Lewis did state, however, that he had heard "rumors" concerning Mills's "attendance at parties, cocaine use, and possibly providing drugs to females with disgruntled husbands and/or boyfriends."

At the end of this interview, the FBI agent handed Lewis his card. At his deposition, the Illinois State Police Investigator confirmed that Lewis was not a particularly "significant" or "helpful" witness. After this interview, Lewis did not have contact with anyone re-

garding the investigation, at least until after his own indictment, which is discussed below.

On December 17, 2006, just days after his discussion with the FBI, Lewis alleges that he had a notable conversation with his brother, Clint Gray. Gray approached Lewis, stating that they needed to talk and "your badge needs to stay in the car" because "this is between brother and brother[.]" Gray stated that he had heard that Lewis had spoken to the FBI and that he was "making some very powerful and dangerous people very uncomfortable." When asked what the FBI knew, Lewis responded that the "FBI has some concerns [Mills] is involved in something not exactly on the up and up with the Playpen." Gray responded that Mills "runs this county" because he has "absolute power . . . to say . . . who does and doesn't go to trial." Gray then explained that in exchange for women and cocaine from Corrie, Mills prosecuted competing drug dealers. Gray also added that Lewis could double his annual income if he went along with this scheme. At the end of this conversation, Gray allegedly asked Lewis if he was "in." Lewis responded that he would not get involved and that he was going to do his job. Gray ended the conversation cryptically, warning "you know I can't protect you, right."

Soon after this alleged conversation with Gray, Lewis claims that Jennifer Garrett, his sister-in-law, told him that Corrie kept an apartment where Mills and the Playpen dancers had sex and used cocaine. According to Lewis, she also stated that she had sex with Damilano

on multiple occasions. Finally, Garrett allegedly added that if she had legal problems, all she had to do is tell law enforcement to contact Damilano.

On March 30, 2007, a Vermilion County grand jury convened to consider criminal charges against Lewis. Six women testified under oath about their encounters: White, Dow, Perry, Garrett, Carrigan, and Grider. Lewis claims that, immediately before the grand jury hearing, Mills asked him what he had told the FBI. When Lewis feigned ignorance, Mills responded, "wrong answer Dave." On April 11, 2007, the grand jury charged Lewis with 49 felony counts involving official misconduct, armed violence, criminal sexual assault, aggravated criminal sexual assault, criminal sexual abuse, and obstructing justice. Lewis was incarcerated while awaiting trial.

On April 3, 2008, Lewis's trial on two of the counts—one count for official misconduct and one count for criminal sexual abuse—convened, and he was acquitted. Notably, at the trial, Dow recanted her earlier grand jury testimony. Specifically, Dow testified that, in late 2006 or early 2007, Corrie called a meeting with the female Playpen employees and told them they would not have to pay "house fees" if they fabricated statements about Lewis because Lewis's presence was hampering Corrie's drug trade. (Presumably, it's harder to sell drugs when cops are milling about.) Dow—not exactly a model of credibility—later recanted this recantation, leading to a perjury conviction. For what it's worth, in her deposition for this case, Dow stated that her 2007

grand jury testimony against Lewis was truthful and that her recantation in April 2008 was false. Dow testified that she changed her story for Lewis's trial because of threats to her children, stating "I'm not going to risk my kids."

Thereafter, on June 9, 2008, a special prosecutor assigned to the case dismissed all of the original charges in return for Lewis's agreement to plead guilty to four class misdemeanors: three counts of official misconduct and one count of obstruction of justice. These charges arose from Lewis's actions toward Audrey White. At the plea hearing, these two charges were described as "lesser included offenses of counts already charged." Lewis was sentenced to one year in jail and one year of conditional discharge, but was given credit for time served and released that same day—after spending 423 days incarcerated. Mills, meanwhile, was never charged with any crimes.

On January 6, 2010, Lewis filed a one-count Amended Complaint against Mills, Damilano, Gray, and Corrie. Each of the four defendants moved for summary judgment. The district judge granted their motions in full, ruling as follows: (1) Mills is entitled to absolute prosecutorial immunity; (2) Damilano is entitled to qualified immunity; (3) there is no evidence that Gray conspired with Mills and Damilano to have Lewis prosecuted; and (4) notwithstanding Dow's April 2008 testimony that Corrie asked the female employees at the Playpen to fabricate evidence against Lewis, "[t]here is still no evidence that Corrie acted in concert with either Mills or

Damilano to frame [Lewis] because [Lewis] spoke with the FBI." This appeal followed. Additional facts are added below as needed.

## II. Discussion

A grant of summary judgment is reviewed *de novo*, construing the facts and drawing all reasonable inferences in the light most favorable to the non-movant—in this case, Lewis. *Castronovo v. Nat'l Union Fire Ins. Co.*, 571 F.3d 667, 671 (7th Cir. 2009) (citation omitted). Further, in a case like this, it is important to remain mindful that "neither the mere existence of some alleged factual dispute between the parties . . . nor the existence of some metaphysical doubt as to the material facts . . . is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

Lewis's claim is one for First Amendment retaliation. Indeed, "[a]n individual may not be subject to criminal prosecution for exercising his right to free speech." *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 626 (7th Cir. 2008) (citation omitted). To establish a *prima facie* case for this type of claim, a plaintiff must demonstrate that: (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter the free exercise of his First Amendment rights; and (3) his speech was a motivating factor in the defendant's re-taliation. *See Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006); *see also Surita v. Hyde*, 665 F.3d 860, 874 (7th

Cir. 2011) (The district judge "was not wrong in refer-encing a burden-shifting test that included a plaintiff's burden to show a motivating factor."). Placing his claim within this framework, Lewis contends that, in retalia-tion for his cooperation with the FBI's investigation and his refusal to join in Mills's corruption, the defendants conspired to convict him of false criminal charges.

**A.  Mills**

Mills argues that he is entitled to absolute prosecu-torial immunity. It is well-settled that prosecutors have absolute immunity for their core prosecutorial actions, *see Hartman v. Moore*, 547 U.S. 250, 261-62 (2006), but "the degree of immunity prosecutors are afforded depends on their activity in a particular case." *Anderson v. Simon*, 217 F.3d 472, 475 (7th Cir. 2000). The Supreme Court has offered useful guidance in drawing this line of demarcation. Specifically, prosecutors are entitled to absolute immunity when they are performing func-tions—such as determining whether charges should be brought and initiating a prosecution—"intimately associ-ated with the judicial phase of the criminal process." *Buckley v. Fitzsimmons*, 509 U.S. 259, 270 (1993) (citation and internal quotations omitted); *see also Spiegel v. Rabinovitz*, 121 F.3d 251, 257 (7th Cir. 1997) (state at-torney's decision regarding which of two complaints should be prosecuted merited absolute prosecutorial immunity). But, prosecutors are *not* entitled to absolute immunity when performing "acts of investigation or administration." *Buckley*, 509 U.S. at 270 (citation and

internal quotations omitted). In other words, "[w]hen the functions of prosecutors and detectives are the same . . . the immunity that protects them is also the same." *Id*. at 276.

So the question arises: did Mills ever deviate from his prosecutorial functions and cross into the investigatory realm? Lewis concedes that Mills is immune from liability "for taking the case to the grand jury, for pursuing an indictment and for prosecuting Lewis." However, Lewis contends that Mills crossed into the investigatory sphere because he was "involved in the investigation and the fabrication of evidence against [Lewis]." Indeed, a showing that a prosecutor investigated and fabricated evidence against a target would automatically defeat absolute prosecutorial immunity, even if that target was later brought to trial. *Id*. ("A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial.").

To bolster his claim against Mills, Lewis emphasizes three strands of evidence: (1) the testimony of Amy Dow and the statement of Jennifer Garrett; (2) the timeline of the investigation of Lewis; and (3) Mills's statement to Lewis at the grand jury proceedings. Unfortunately for Lewis, none of this evidence shows that Mills took an investigative role in his prosecution.

First, Lewis highlights the ever-vacillating testimony of Amy Dow—specifically, the testimony from the April 2008 trial, when she claimed that Corrie wanted the female employees at the Playpen to fabricate allegations against Lewis. From there, Lewis highlights his recollection of a conversation he had with Jennifer Garrett (a conversation that she denies ever occurred), in which she stated that she and other Playpen dancers would meet at Corrie's apartment, use cocaine, and have sex with Mills. When viewing these statements together, Lewis argues, they "clearly link Corrie and Mills to a cocaine conspiracy."

We are not persuaded that this evidence furthers Lewis's cause. Even if Amy Dow's April 2008 testimony can be credited (which is unclear, given that it later formed the basis of a perjury conviction), such testimony never linked Mills to any scheme to frame Lewis; it only implicated Corrie. And, even setting aside serious hearsay concerns, Garrett's statement may be evidence that Mills is an unsavory character who associates with Corrie; however, it does nothing to show Mills's participation in an effort to frame Lewis.

Second, Lewis emphasizes the timeline of events. In doing so, he devotes considerable time to poking holes in the veracity of Danielle Perry's allegations—the allegations that catalyzed Kaag's initial investigation of Lewis. Lewis then emphasizes that no disciplinary action was taken after Perry, Rebecca Lee, and Lacrisha Carrigan leveled allegations against him—all *before* he spoke to the FBI. Lewis infers that Kaag's failure to act

shows that he did not find these allegations to be credible and therefore did not take them seriously. According to Lewis, though, this all changed in the wake of his communications with the FBI. On this point, Lewis notes that "[t]he investigation that had been dormant for more than eight months became revived, Lewis was told by Gray that he was messing with the wrong person (Mills) and, according to Dow, strippers were given a financial incentive by Corrie to fabricate evidence against Lewis." Lewis argues that this timeline is telling, and that a reasonable jury could infer that Mills took part in the investigation and conspired to fabricate evidence against him.

Lewis's argument is mere speculation, and it is well-settled that "conjecture alone cannot defeat a summary judgment motion." *Delapaz v. Richardson*, 634 F.3d 895, 901 (7th Cir. 2011) (citation omitted). The evidence shows that, at all relevant times, non-party Kaag (and Kaag alone) spearheaded the investigation of Lewis, and Mills played no meaningful role in this operation. Kaag's testimony—which remains undisputed—is that he did not turn this matter over to Mills until after the investigation was completed and the case was ready for a grand jury. There is no evidence, for instance, that Kaag was taking directions from Mills or that the two had meaningful communications about Lewis (outside of their initial perfunctory communication that the Sheriff's Department would be investigating Lewis). Moreover, Lewis's chronology ignores the fact that, after he spoke to the FBI in a brief conversation in which nothing meaningful was conveyed, five additional women came

forward with allegations against him (White, Forshier, Grider, Garrett, and Dow). In short, Lewis's emphasis on the timeline does not help build a logical bridge that Mills ever deviated from his core prosecutorial function.

Finally, Lewis highlights the exchange between him and Mills during the grand jury proceedings, in which Lewis feigned ignorance about the FBI's investigation of Mills, and Mills responded "wrong answer Dave." Lewis claims that, from this statement, "[a] jury could certainly conclude that this bizarre behavior was direct evidence of Mills framing Lewis." Emphasizing this evidence contradicts a concession made earlier in Lewis's brief: that Mills is immune from liability "for taking the case to the grand jury, for pursuing an indictment and for prosecuting Lewis." Simply stated, when Mills made this statement, he was in the process of taking Lewis's case before a grand jury—a core prosecutorial function.

In sum, Lewis's evidence does little to shed light on his shadowy conspiracy allegations involving Mills. *See Evers v. Reak*, 21 Fed. Appx. 447, 450 (7th Cir. 2001) ("Vague and conclusory allegations of the existence of a conspiracy are not enough to sustain a plaintiff's burden . . . ."). Here, the evidence shows that, to put it charitably, Mills was far from a saint. What the evidence does not show, however, is that Mills deviated from his prosecutorial role. Accordingly, Mills is entitled to absolute prosecutorial immunity.

**B. Damilano**

As an initial matter, it is worth noting that Lewis's brief fails to develop a cogent argument explaining how the Sheriff's Department Investigator Damilano fits into this conspiracy. Instead, Lewis merely writes that, in light of the above evidence, "a jury could permissibly conclude that Damilano . . . participated in a conspiracy to frame Lewis." Given the cursory nature of this argument, Lewis comes close to waiving this issue for appeal. *See Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009) ("[U]nsupported and underdeveloped arguments are waived.") (citation and internal quotations omitted).

For the sake of thoroughness, however, we will speak to this issue briefly. The Supreme Court has noted that, under certain circumstances, a claim for "retaliatory inducement to prosecute" can be brought against a non-prosecutor "who may have influenced the prosecutorial decision but did not himself make it[.]" *Hartman*, 547 U.S. at 262. To prevail on this claim, the plaintiff "must show that the nonprosecuting official acted in retaliation, and must also show that he induced the prosecutor to bring charges that would not have been initiated without his urging." *Id*. As such, "the causal connection required here is not merely between the retaliatory animus of one person and that person's own injurious action, but between the retaliatory animus of one person and the action of another." *Id*.

Suffice it to say that Lewis has not unearthed any evidence showing that Damilano possessed the requisite

animus for this type of claim (let alone evidence of a causal nexus between Damilano's animus and Mills's decision to prosecute). Rather, the evidence shows that, at all relevant times, Damilano worked under non-party Kaag's supervision. This lack of evidence is fatal to Lewis's claim.

## C.  Gray and Corrie

Lewis again takes a cursory approach to his claims against non-government defendants Gray and Corrie, simply writing that, given the evidence described above, "a jury could permissibly conclude that . . . Corrie and Gray . . . participated in a conspiracy to frame Lewis." Complicating matters, Corrie and Gray did not respond with an appellate brief. Moreover, in a negligent fashion, they also failed to respond to this Court's show cause order. Therefore, this appeal was submitted for a decision without the filing of a brief or oral argument on behalf of Corrie and Gray. Fortunately for them, their failure does not change the outcome of this case.

As to Gray, there is no evidence linking him to a conspiracy. Gray's alleged involvement consists of warning Lewis that he was "making some very powerful and dangerous people very uncomfortable" and that he could not "protect" Lewis. These statements do not connect Gray to a scheme to frame Lewis. Therefore, Lewis's claim against Gray fails.

Next, unlike his claims against Mills, Damilano, and Gray, Lewis arguably can point to tangible evidence

that Corrie was out to get him: specifically, Dow's April 2008 testimony, which later formed the basis of her perjury conviction. Importantly, however, to establish § 1983 liability through a conspiracy theory, "a plaintiff must demonstrate that: (1) a state official and a private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participant[s] in joint activity with the State or its agents." *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007) (citation and internal quotations omitted); *see also Hughes v. Meyer,* 880 F.2d 967, 972 (7th Cir. 1989) (for a private party to act under color of state law, "there must be a conspiracy, an agreement on a joint course of action in which the private party and the state have a common goal") (citation and internal quotations omitted).

Plainly stated, there is no evidence that Corrie acted in concert with a state official—Mills or Damilano—to frame Lewis because of his participation in the FBI's investigation. Instead, the evidence, assuming it can be considered, only shows that Corrie wanted to frame Lewis because his presence at the strip club was hampering Corrie's drug business. In other words, because the claims against Mills and Damilano have failed, the claim against Corrie necessarily suffers the same fate.

Finally, although defendants did not make this argument, the Court would be remiss not to underscore a notable fact: Lewis pled guilty to class A misdemeanor charges of obstruction of justice and official misconduct.

But, here, a judgment in Lewis's favor would to some degree vindicate him, given that defendants allegedly participated in a scheme to fabricate evidence against him. Importantly, however, such vindication is inconsistent with his guilty plea. On this point, it is well-settled that *Heck v. Humphrey*, 512 U.S. 447 (1994) bars a plaintiff from maintaining a § 1983 action where a judgment in favor of the plaintiff would necessarily imply that his conviction was invalid. *See McCann v. Neilsen*, 466 F.3d 619, 621 (7th Cir. 2006). In other words, in light of Lewis's guilty plea, an argument exists that his claims against defendants were doomed from the outset. At oral arguments, Lewis's counsel suggested that the guilty plea— for four class A misdemeanors—is, in effect, severable from the far more serious original 49 felony charges. Fortunately, we need not wade deeply into this issue, given the lack of evidence supporting Lewis's overarching theory of a conspiracy.

## III. Conclusion

For the foregoing reasons, we AFFIRM the decision of the district court.