In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2877

JAMES BRUNSON and BRUNSON PACKAGE, INC.,

*Plaintiffs-Appellants*,

*v.*

SCOTT MURRAY, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:12-cv-00225-NJR-DGW — **Nancy J. Rosenstengel**, *Judge*.

ARGUED FEBRUARY 24, 2016 — DECIDED DECEMBER 13, 2016

Before EASTERBROOK, ROVNER, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Plaintiff James Brunson owns a package liquor store in Bridgeport, Illinois. He asserts that city officials violated his constitutional rights by refusing to renew his liquor license and orchestrating a campaign of harassment and outright violence. Brunson has offered evidence that after he purchased the business, he was subjected to continued harassment by the defendants, including Max Schauf,

the town's mayor and local liquor commissioner. When Mayor Schauf refused to consider Brunson's application for a routine renewal of his liquor license, Brunson was forced to close his business and to alert state authorities to reopen. A few weeks later, while keeping watch over his store late at night after vandalism incidents, Brunson was attacked by one of Schauf's associates. The two men fought until Brunson was able to pin down the attacker and call police. Two weeks later, Brunson was the one arrested for felony aggravated battery.

Brunson brought this suit under 42 U.S.C. § 1983 alleging federal claims of false arrest, denial of equal protection, and denial of due process, as well as several state-law claims. The district court granted summary judgment on Brunson's federal claims and dismissed the state-law claims without prejudice. We affirm in part and reverse in part. We affirm summary judgment for prosecutor Lisa Wade, who is protected by absolute prosecutorial immunity for her role in this case. We also affirm summary judgment for the City of Bridgeport and for all remaining defendants as to Brunson's false arrest claim. But we reverse summary judgment on Brunson's class-of-one equal protection claim. We also reverse summary judgment for Schauf and hold he is not entitled to absolute immunity on Brunson's due process claim for Schauf's refusal to act on the liquor license renewal.

I.  *Factual and Procedural Background*

On appeal from a grant of summary judgment to the defendants, we construe the evidence in the light reasonably most favorable to the plaintiffs and give them the benefit of all reasonable inferences from that evidence, without vouching for the objective truth of this account. E.g., *Chaib v. GEO Group, Inc.*, 819 F.3d 337, 340–41 (7th Cir. 2016).

A. *Brunson's Liquor Store*

In the summer of 2008, James Brunson purchased the only liquor store in Bridgeport, Illinois. As part of the purchase, he obtained a liquor license. Brunson's store was one of only five places to buy alcohol in Bridgeport.

Bridgeport Police Chief Scott Murray was a frequent visitor to the shop. He often told Brunson that he was violating state and local liquor laws. Brunson would try to track down the laws Murray accused him of violating, only to find they did not actually exist. On one occasion, Chief Murray told Brunson that he had to be a Bridgeport resident to own a liquor business. Brunson, finding this odd, called Bridgeport Mayor Max Schauf, who was also the local liquor commissioner. Schauf "confirmed" that such a law was on the books, but it was not.

There is evidence that Schauf's interest in Brunson's business was a matter of self-interest. First, Schauf had made a competing offer to purchase the store and had lost out to Brunson. Also, Schauf already owned or had an interest in one of the other establishments in town that served alcohol—Red Hills Veterans Club—by way of subterfuge. The Veterans Club was ostensibly run by Beverley Pruez. An investigation by the Illinois Liquor Control Commission revealed that Pruez had a romantic relationship with Schauf, who had owned the club and signed liquor license renewals under the table for Pruez. And Schauf's son Mark would open another Bridgeport bar and restaurant called "The Place to Be." Since Schauf was the local liquor commissioner, this type of self-regulation would of course be verboten.

B.  *2010 Liquor License Renewal*

In April 2010, Brunson applied to renew his liquor license several weeks before it would expire. This is typically a simple process. A licensee with no violations is entitled to a *pro forma* license renewal. Instead, Chief Murray visited for an inspection. Brunson asked if there would be any trouble with the license renewal. Chief Murray told him to hire a lawyer. Receiving no updates on the status of his application, Brunson called Schauf the day his license was set to expire. Schauf told Brunson that he would not be renewing the license in time and did not know when he would make a decision. On May 1, with Mayor Schauf running out the clock, Brunson was forced to shutter his business and hire counsel.

Brunson contacted the state Commission, which assigned Special Agent Randal Mendenhall to investigate. Schauf told Mendenhall that he was taking time to review Brunson's license. Mendenhall pointed out that under state law, Schauf did not have this type of discretion: Schauf could renew or not renew the license, but he was not entitled to delay indefinitely. The state Commission ordered that Brunson be allowed to operate the store pending a hearing.

Brunson re-opened his store, prompting another visit from Chief Murray to ask: "What makes you think you can reopen your store when we say you can't." Brunson's liquor supplier also received a call from the city clerk saying it could no longer sell to Brunson. Brunson showed Murray the Commission's order, and the supplier continued to sell to Brunson when the city clerk could not give any specific reason for the prohibition. Shortly before the Commission's scheduled hear-

ing over Brunson's license, Schauf renewed the license without comment or explanation and backdated it to make it appear as if he had renewed it on time.

C. *The Violent Events of August 7, 2010*

Brunson's experience as a store owner worsened still further in the summer of 2010. One weekend in July, Brunson discovered that someone had attempted to break into the store by trying to remove the back door from its hinges. The act appeared to be both premeditated and at least a little sophisticated. The vandal had left behind a flashlight and safety glasses and had chipped away the door to get at the dead bolt. Chief Murray visited the scene but dismissed the incident as the work of teenagers. He did not file a police report. The following weekend, Brunson discovered that the compressor outside his store had been vandalized. He again called police but found no satisfaction.

Sensing a pattern, and finding little help from the local police, Brunson turned to self-help. He stood guard over his store the next weekend, armed with a loaded gun. A little past 3:00 a.m. on August 7, Brunson noticed a car crawling back and forth past his store. Then the car stopped, a man emerged, and Brunson heard the store's front windows shatter. He hurried to the scene and found Jody Harshman—a convicted felon, an off-and-on employee at Mayor Schauf's businesses, and a friend of the Schauf family.

Harshman raised a hammer and turned on Brunson, who in turn raised his gun. Harshman thought Brunson was bluffing and moved toward him. Brunson, who was not bluffing, pulled the trigger but the gun jammed. Harshman threatened, "Now you're f***ing dead," and swung the hammer at

Brunson. Brunson blocked the blow and the two men fought. Brunson's gun fired and Harshman fled.

Brunson did not disengage. Trailing Harshman at a distance, he called authorities. Before police arrived, Harshman tossed his hammer away, and in doing so caught sight of Brunson. Harshman charged at Brunson, who felled Harshman with a blow to the face. When Harshman tried to get up, Brunson knocked him down again with a kick. Brunson fixed the jam on his gun and held Harshman at gunpoint until police arrived. Brunson also noticed a car parked nearby with Mark Schauf—son of Mayor Schauf and a friend of Harshman—inside. As Harshman was being placed in an ambulance, Chief Murray reached the scene and took over the investigation. Brunson gave his account of the incident; he also pointed Murray's attention to Mark Schauf and asked whether Murray should be involved in the investigation.

Another officer at the scene, Officer Dooley, later explained the significance of this exchange. There was no good reason for Mark Schauf to have been at the scene in the early hours of the morning. In Dooley's opinion, there was a "likelihood that Mark Schauf may have been an accomplice involved in planning or carrying out the crime," a suspicion Dooley said Murray shared. And given that Mark's father was Chief Murray's boss, "Murray should not have investigated this case himself." Dooley believed that officers from a different jurisdiction—preferably the state police—should take over the investigation. Nonetheless, Chief Murray stayed on the case.

Two weeks later, on August 20, both Harshman and Brunson were arrested. Harshman was charged with criminal damage to property and pled guilty to a misdemeanor.

Brunson was charged with felony aggravated battery. He pled not guilty. At least at the time of the district court's decision in 2014, that case was still pending.

D. *Procedural History*

Brunson's § 1983 suit alleged violations of both federal and state law by Mayor Schauf, Chief Murray, State's Attorney Lisa Wade, Harshman, the city of Bridgeport, and Lawrence County. The three federal-law claims were: (1) false arrest, (2) denial of equal protection under the Fourteenth Amendment, and (3) denial of due process under the Fourteenth Amendment. The three state-law counts were: (1) tortious interference with business expectation, (2) conspiracy, and (3) tortious supervisory liability against the city and county.

On defendants' motions for summary judgment, the district court first held that State's Attorney Wade was absolutely immune from liability for her role in prosecuting Brunson for battery and that Lawrence County was entitled to summary judgment because Brunson failed to respond to the county's motion. On the merits, the district court granted summary judgment to all defendants on the false arrest claim (Count 1) because there was probable cause to arrest Brunson for battery. The court granted summary judgment on the equal protection claim (Count 2) because Brunson did not have evidence of similarly situated comparators. The court granted summary judgment on the due process claim (Count 3) based on *Killinger v. Johnson*, 389 F.3d 765 (7th Cir. 2004), where we said that a local Illinois liquor commissioner had absolute judicial immunity even if his official actions were riddled with errors. The district court declined supplemental jurisdiction over the three state-law claims and dismissed them without prejudice.

We review a grant of summary judgment *de novo. United Central Bank v. KMWC 845, LLC*, 800 F.3d 307, 310 (7th Cir. 2015). As noted, we construe the evidence in the light most favorable to Brunson as the non-moving party and give him the benefit of all reasonable inferences in his favor. *Tolan v. Cotton*, 572 U.S. —, 134 S. Ct. 1861 (2014); *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 462 (7th Cir. 2016).[1]

II. *Prosecutorial Immunity*

Brunson claims that prosecutor Wade participated in his false arrest and deprived him of the equal protection of the laws. She is entitled to summary judgment based on absolute prosecutorial immunity.

Wade's first involvement with Brunson's case came after the violent August 7 incident. On August 11, after the Bridgeport police finished their investigation, Chief Murray turned the case file over to Wade. After Murray and Wade discussed the case, Wade's office prepared a formal charge of aggravated battery and sought an arrest warrant, which was issued on August 20. Before the arrest, Wade also spoke with Officer Dooley, who confirmed that Chief Murray alerted her to Mark Schauf's presence at the scene. Wade also recognized Chief

---

[1] Brunson's co-plaintiff is the corporate entity, Brunson Package, Inc., through which Brunson purchased the package liquor store. The district court and the appellate briefs did not differentiate between the two, nor do we, though we presume the corporate plaintiff could have no claim for false arrest. On remand, it may be necessary to look more carefully at the two plaintiffs. See, e.g., *Assaf v. Trinity Medical Center*, 821 F.3d 847, 849 (7th Cir. 2016) (individual plaintiff could not assert claim for money that should have been paid to professional corporation).

Murray's possible conflict of interest. Wade would later appear on behalf of the State at Brunson's probable cause hearing.

Prosecutors are absolutely immune from liability "for their core prosecutorial actions." *Lewis v. Mills*, 677 F.3d 324, 330 (7th Cir. 2012), citing *Hartman v. Moore*, 547 U.S. 250, 261–62 (2006) (prosecutor "is absolutely immune from liability for the decision to prosecute"); see also *Spiegel v. Rabinovitz*, 121 F.3d 251, 257 (7th Cir. 1997) ("Under Illinois law, the State's Attorney … is vested with exclusive discretion in the initiation and management of a criminal prosecution."). When a prosecutor performs investigative or administrative actions, however, she receives only the qualified immunity afforded to law-enforcement officers. *Lewis*, 677 F.3d at 330, quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 276 (1993). Core actions covered by absolute prosecutorial immunity are those "intimately associated with the judicial phase of the criminal process." *Lewis*, 677 F.3d at 330, quoting *Buckley*, 509 U.S. at 270.

The issue is whether the prosecutor was acting as an officer of the court and performing actions related to the judicial rather than investigative phase of the criminal process. *Fields v. Wharrie*, 672 F.3d 505, 510 (7th Cir. 2012). For example, a prosecutor is not absolutely immune when she swears to the facts in a charging document—an investigative function—but she is absolutely immune for signing the charging document itself and initiating a prosecution. *Olson v. Champaign County*, 784 F.3d 1093, 1102–03 (7th Cir. 2015) (no immunity for Illinois prosecutor swearing to allegedly false information to obtain arrest warrant).

Absolute prosecutorial immunity covers Wade's conduct in this case. Wade's decision to charge Brunson with battery

and her appearance at Brunson's preliminary hearing were core prosecutorial functions. Nor does Brunson allege that Wade omitted exculpatory evidence in bad faith. Brunson argues, though, that Wade is not immune for her failure to call for the state police to take over the investigation in light of Chief Murray's conflict of interest. We reject this argument. The prosecutor's choice to accept the police report and go forward with the prosecution without seeking further investigation by the state police was not an investigative act. It was a deliberate decision not to interfere with the investigation. Wade's work began after the police investigation had ended. See *Fields*, 672 F.3d at 512 ("Prosecutors do not function as advocates before probable cause to arrest a suspect exists.").

III. *Equal Protection Claim*

This leaves Brunson's three federal claims against the remaining defendants: Mayor Schauf, Chief Murray, and the City of Bridgeport. We focus first on Brunson's most straightforward claim, that the defendants violated his Fourteenth Amendment right to equal protection of the law. The crux of this claim is that Mayor Schauf, with the aid of the other defendants, harassed Brunson under color of state law in an attempt to drive him out of business for Schauf's own personal gain or other illegitimate purposes. Brunson's equal protection claim covers the entire campaign against him, including Schauf's arbitrary delay in renewing Brunson's liquor license as well as the harassment by law enforcement, the interference in his business, the vandalism of his store, and the investigation of his violent encounter with Harshman.

The Equal Protection Clause guards against government discrimination on the basis of race and other immutable characteristics, but it also extends to protect people from so-called

"class-of-one" discrimination in which a government arbitrarily and irrationally singles out one person for poor treatment. *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012). These class-of-one claims are designed to prevent government actors from singling out a person for arbitrary abuse. See *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Class-of-one discrimination "is illustrated when a public official, 'with no conceivable basis for his action other than spite or some other improper motive … comes down hard on a hapless private citizen.'" *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013), quoting *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005) (alteration in original).

The district court determined that Brunson's claim failed for lack of evidence that defendants treated other similarly situated persons better than they treated him. Citing the Supreme Court's decision in *Village of Willowbrook*, the court wrote that a class-of-one claim requires a two-part showing: first, that a plaintiff was intentionally treated worse than similarly situated comparators, and second, that there was no rational basis for the different treatment. Brunson's claim failed, the court said, because he did not produce evidence of similarly situated licensees in Bridgeport who had been treated better during their own licensing processes. Instead, his claim focused too heavily on prong two of the equal protection analysis. See *Srail v. Village of Lisle*, 588 F.3d 940, 945–46 (7th Cir. 2009) (granting summary judgment to defendants where plaintiffs failed to raise genuine issue of material fact with respect to similarly situated comparators).[2]

---

[2] Defendants did not assert absolute immunity against this claim.

The elements of class-of-one claims have remained unsettled since this court's decision in *Del Marcelle v. Brown County Corp.*, 680 F.3d 887 (7th Cir. 2012) (en banc). In that case, the en banc court produced three separate opinions in a tie vote affirming the district court's dismissal of the suit. The crux of the disagreement was whether the plaintiff in a class-of-one claim must demonstrate only that there is no possible justification or rational basis for the defendant's actions, *id*. at 900 (Easterbrook, C.J., concurring in the judgment), or if the plaintiff must demonstrate a lack of justification *and* also present evidence of hostile intent or animus, *id*. at 889 (Posner, J., plurality opinion), or if the plaintiff must demonstrate an absence of rational basis, which can be satisfied with evidence of animus, *id*. at 913 (Wood, J., dissenting). Brunson's class-of-one claim survives summary judgment under all three standards.

The standard in Judge Easterbrook's opinion gives motive and intent in class-of-one suits "no role at all." *Id.* at 900 (Easterbrook, C.J., concurring). Class-of-one claims must simply address "whether a rational basis can be *conceived*, not whether one is established on the record or occurred to a defendant." *Id*. Under that standard, the "only proper use of intent in a class-of-one case is to show that discrimination exists." *Id*.

The standard in Judge Posner's plurality opinion requires the plaintiff to demonstrate that "he was the victim of discrimination intentionally visited on him by state actors who knew or should have known that they had no justification, based on their public duties, for singling him out for unfavorable treatment—who acted in other words for personal reasons, with discriminatory intent and effect." *Id*. at 889 (Posner, J., plurality opinion) (emphasis in original removed).

And the third standard, explained in Judge Wood's dissent joined by four additional judges, laid out four elements to a class-of-one claim: "(1) plaintiff was the victim of intentional discrimination, (2) at the hands of a state actor, (3) the state actor lacked a rational basis for so singling out the plaintiff, and (4) the plaintiff has been injured by the intentionally discriminatory treatment." *Id*. at 913 (Wood, J., dissenting). Under this standard, "personal animus, illegitimate motives, [and] inexplicable deviations from clear rules" illustrate the kind of facts a plaintiff may rely upon to demonstrate that a lack of rational basis is plausible. *Id*.

While we await a final resolution of the doctrinal debate, Brunson's claim survives summary judgment under all three standards. First, while earlier cases cited by the district court had required evidence of similarly situated comparators, see *Srail*, 588 F.3d at 945 (7th Cir. 2009); *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1002 (7th Cir. 2006), our more recent cases have made clear that such evidence is not always required. Evidence of similarly situated individuals is not required as part of a formalistic mandate, but such evidence may help to establish disparate treatment: "if all principal characteristics of the two individuals are the same, and one received more favorable treatment, this may show there was no proper motivation for the disparate treatment." *Swanson*, 719 F.3d at 784. Some cases, however, present the circumstance where disparate treatment "is easily demonstrated but similarly situated individuals are difficult to find." *Id.* These class-of-one claims are also viable. See, e.g., *Miller v. City of Monona*, 784 F.3d 1113, 1120–21 (7th Cir. 2015) (collecting cases).

For instance, in *Geinosky v. City of Chicago*, we reversed a dismissal based on a plaintiff's failure to identify and describe comparators in his complaint. 675 F.3d at 748–49. The pattern of the defendants' conduct toward the plaintiff—two dozen false parking tickets in fourteen months—demonstrated on its own "the officers' improper discriminatory purpose. … [W]here the alleged facts so clearly suggest harassment by public officials that has no conceivable legitimate purpose," the plaintiff did not need to identify comparators. *Id*. at 748.

Our later en banc decision in *Del Marcelle* found common ground in supporting the *Geinosky* approach to comparators. We said that if the allegations signal that the plaintiff alone suffered the defendant's harassment, there is no need to identify a comparator. 680 F.3d at 914–15 (Wood, J., dissenting); see also *id.* at 898 (Posner, J., plurality opinion) (demonstrated pattern against one individual "adds up to deliberate and unjustified official harassment" even without comparators), quoting *Geinosky*, 675 F.3d at 745.

Defendants argue here, and the district court agreed, that because Brunson held the only Class B liquor license in Bridgeport, he could not identify any similarly situated comparators. Bridgeport is a small town of 2,500, with just five establishments selling or serving any liquor. Brunson owned the only package liquor store and Class B liquor license. Thus, as in many small communities, it would have been practically impossible for Brunson to produce similarly situated comparators among Class B liquor license holders as distinguished from Class A restaurants and Class C clubs. In this case, requiring Brunson to produce a comparator among Class B liq-

uor establishments "would not help distinguish between ordinary wrongful acts and deliberately discriminatory denials
of equal protection." *Geinosky*, 675 F.3d at 748.

Brunson offered evidence of a pattern of discriminatory
behavior on the part of a government. As we recognized in
*Geinosky*, such a pattern can perform the same function as the
similarly situated requirement in other class-of-one claims.
*Id.*[3] As the district court noted, Chief Murray repeatedly visited "to inform Brunson that he and his store were in violation" of non-existent state and local liquor laws. Mayor Schauf
attempted to single Brunson out with a proposed local rule
that would have driven only him out of business. When
Schauf arbitrarily refused to act on his license renewal,
Brunson was forced to close his store and hire counsel. A city
official tried to intimidate Brunson's liquor supplier in an attempt to cut off Brunson's receipt of product. Brunson also

---

[3] Even if this were not the case, Brunson also provided the district
court with evidence of similarly situated comparators. The process of obtaining license renewal is identical for Class A, Class B, and Class C establishments. Brunson claims that no other business that needed to renew its
liquor license—including at least one Class C club in which Mayor Schauf
held an ownership interest—experienced the same harassment, scrutiny,
and delay that he and his store experienced. The district court could and
should have found sufficient evidence of similarly situated comparators.
See *Swanson*, 719 F.3d at 782, 785 (noting, in a case where a mayor used his
position to harass an abutting neighbor over the building of a fence, that
a resident in the same neighborhood whose property did not abut the
mayor's property and who was treated better could be "helpful in indicating the norm governing the regulation of fences" in the town, and "could
be invoked as additional support for a direct showing of animus," if the
direct evidence were less strong than in the present case).

produced an affidavit from Agent Mendenhall that reason-ably described this behavior as harassment.

Brunson has also offered evidence sufficient to avoid sum-mary judgment that there was no rational and legitimate basis for Mayor Schauf to single out Brunson for discriminatory treatment. He had no overwhelming number of license re-newals to review nor insufficient resources to do so. The av-erage was not even one renewal per month. According to the State Commission's Agent Mendenhall, Schauf had no discre-tion to delay the *pro forma* renewal. As Brunson emphasizes in his brief, even Schauf himself—from the time Brunson and Agent Mendenhall first inquired until he submitted his appel-late brief—has not offered a reason, "any reason, not even a spurious reason, for his inaction." A jury could find that Schauf had no conceivable justification for his actions based on his public duties as liquor commissioner. See *Del Marcelle*, 680 F.3d at 900 (Easterbrook, C.J., concurring in the judg-ment).

Accordingly, Brunson has shown a lack of rational basis so that his claim survives summary judgment under Judge Easterbrook's standard in *Del Marcelle*. Still, "something other than the normal rational-basis test applies to class-of-one claims," *id*., even if that something has not been clearly delin-eated. Brunson will need to address intent on remand.[4]

---

[4] While the standard in class-of-one cases remains unsettled, district judges may find it prudent to use jury instructions and verdict forms to distinguish between findings of hostile animus and findings of objectively arbitrary acts that lack justification based on public duties.

With regard to hostile intent and animus, whether the standard requires it or only allows its use as evidence, the pattern of harassment and discriminatory acts driven by Schauf's personal interests in Bridgeport is sufficient to satisfy both the plurality and dissenting opinions in *Del Marcelle*. See *id*. at 889, 913. Brunson, supported by Mendenhall's affidavit, paints a clear picture of the motive for this pattern of behavior: Schauf had a number of personal interests adverse to Brunson's store, and he sought to harass Brunson to drive him out of business. Brunson has offered evidence of substantial animus and a continuing misuse of power by government agents akin to an "orchestrated campaign of official harassment motivated by sheer malice" that we have said is sufficient (though it may not be necessary) to support an equal protection claim. *Olech v. Village of Willowbrook*, 160 F.3d 386, 388 (7th Cir. 1998) (internal quotation marks omitted), *aff'd*, 528 U.S. 562 (2000).

Courts must handle class-of-one claims carefully to avoid turning "every squabble over municipal services, of which there must be tens or even hundreds of thousands every year, into a federal constitutional case." *Id.* But the severity and extent of the defendants' harassment shown by Brunson's evidence convince us that this claim should go to trial.

## IV. *False Arrest*

We turn to Brunson's false arrest claim. Brunson was arrested on August 20 on a warrant. Brunson argues that Murray participated in his arrest but lacked probable cause to believe he had committed the crime charged. Brunson contends that clear evidence of self-defense defeated any probable cause to support an arrest for aggravated battery. The district court, reasoning that affirmative defenses play no part in the

probable cause determination, granted the defendants' motion for summary judgment on the claim. We affirm but on a different ground.

The key point is that Chief Murray arrested Brunson on the basis of an arrest warrant. A state court issued the facially valid warrant upon application by the prosecuting attorney. Murray concluded his investigation and turned over his police report to State's Attorney Wade. Wade then reviewed the police report and determined there was probable cause to arrest Brunson for aggravated battery. Her office prepared, and she personally signed, a charging document for Brunson. Chief Murray affirmed the factual allegations: that Brunson committed a battery in that he "struck Jody Harshman in the head and kicked Jody Harshman in the face, head, and chest." A court issued an arrest warrant for Brunson on August 20, and Murray arrested Brunson that day.

When a person has been arrested as a result of such formal legal processes, his claim is not for an unconstitutional false arrest but (perhaps, if at all) for malicious prosecution, which we leave to state law in Illinois. See *Bianchi v. McQueen*, 818 F.3d 309, 321 (7th Cir. 2016).[5] A police officer who receives a facially valid arrest warrant is ordinarily expected to act upon it, not to second-guess the court's decision to issue it. The officer does not personally violate the Constitution by making the arrest the court has authorized.

---

[5] The Supreme Court is now considering a case that may shed new light on these doctrinal issues. See *Manuel v. City of Joliet*, 590 Fed. Appx. 641 (7th Cir. 2015), *cert. granted*, No. 14-9496, 136 S. Ct. 890 (2016). The Court heard oral argument in *Manuel* on October 5, 2016.

We have recognized a narrow exception to this rule where a reasonable officer would have known that the evidence provided to support the warrant failed to establish probable cause. *Williamson v. Curran*, 714 F.3d 432, 442 (7th Cir. 2013). That exception does not apply here. Chief Murray was entitled to investigate, to turn over the results to the prosecutor, and to let the prosecutor and then the court figure out if there was probable cause for the arrest or whether Brunson was clearly acting in self-defense. This case therefore does not present an issue concerning the scope of a police officer's duty, on the street, to evaluate available evidence of an affirmative defense. See *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009) (officer may end investigation once he has probable cause, but "may not ignore conclusively established evidence of the existence of an affirmative defense," though Fourth Amendment imposes no duty to investigate validity of defense), quoting *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1061 (7th Cir. 2004).

A second narrow exception could apply if Murray himself "knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and [if] the false statements were necessary to the judicial officers' determinations that probable cause existed for the arrests." See *Beauchamp v. City of Noblesville*, 320 F.3d 733, 742–43 (7th Cir. 2003), citing *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). This can include law enforcement deliberately or recklessly failing to inform the judicial officer of facts negating probable cause. *Id.* at 743. Brunson has not offered evidence that Murray deliberately or recklessly made any false statement or omitted any critical fact. He has not identified anything in Murray's police report or in the factual portion of the application for an arrest warrant that is demonstrably deceptive or

false. Accordingly, Brunson has not cleared the high bar to support his false arrest claim.

## V.  *Due Process and Mayor Schauf's Immunity*

We next address Brunson's claim that he was deprived of a property interest (his liquor license) without due process of law when Mayor Schauf refused to act in a timely manner on his application to renew the annual license. According to Brunson, the license should have been renewed automatically. Schauf's refusal to act forced Brunson to close his business until he could persuade the state Commission to step in and allow him to reopen. The district court granted summary judgment to Schauf on this claim based on the defense of absolute quasi-judicial immunity. The district court correctly limited its discussion of immunity to Brunson's due process claim.[6]

The district court's grant of absolute immunity for action on a license renewal has support in our opinions in *Killinger v. Johnson*, 389 F.3d 765 (7th Cir. 2004), and *Reed v. Village of Shorewood*, 704 F.2d 943 (7th Cir. 1983), which hold or indicate that absolute immunity is available not only for a local liquor commissioner's decisions to suspend or revoke licenses, but also for actions on license renewals. On further consideration,

---

[6] Schauf's absolute immunity defense does not affect Brunson's broader equal protection claim because his claim of harassment "extends beyond [Schauf's] conduct as local liquor control commissioner … to his nonjudicial, nonlegislative conduct as mayor." *Reed v. Village of Shorewood*, 704 F.2d 943, 951 (7th Cir. 1983) (reversing in part summary judgment for defendant acting as both mayor and local liquor commissioner). As in *Reed*, when a defendant is both mayor and local liquor commissioner, we separate out claims that primarily concern the defendant's actions in the mayoral role. *Id*.

however, and in light of supplemental briefing on the question, we conclude that those cases must be narrowed so as to exclude license renewal decisions. The key holding expressed in *Reed* based its grant of absolute immunity for license renewal decisions on a view of Illinois law that is no longer accurate and on a broad view of absolute immunity that the Supreme Court has narrowed. We reverse the grant of absolute immunity to the mayor with respect to the non-renewal of Brunson's liquor license.

We start the analysis with the Supreme Court's approach to the strong medicine of absolute immunity. Absolute immunity is a powerful shield attaching primarily to judicial functions—not to the person or position. *Cleavinger v. Saxner,* 474 U.S. 193, 201 (1985), citing *Butz v. Economou,* 438 U.S. 478, 511 (1978). When a functional analysis of the responsibilities at issue reveals that they are judicial in nature, the actor is entitled to absolute immunity from damages no matter how erroneous the act or injurious the consequences. *Id.* at 199–200. If the functions are not judicial in nature, however, then absolute immunity is not available. The official is left with the still-important protection of qualified immunity, which defeats individual liability unless his or her actions were contrary to clearly established law. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Under the reasoning of *Cleavinger* and *Butz*, the action of renewing or not renewing an Illinois liquor license is a bureaucratic and administrative act—not a judicial act. Under state law, a local liquor commissioner's action on a license renewal lacks the procedural formalities and protections that apply to the same official's decision to suspend or revoke a

license. The differences are great enough to produce different results for the availability of absolute immunity.

An overview of the state statute and facts of this case is helpful here. Under the Illinois Liquor Control Act, a liquor license holder is entitled to important procedural protections when a local liquor commissioner acts to suspend or revoke a license and/or to impose a fine. Those actions by a local liquor commissioner require a public hearing, with at least three days' written notice. The licensee must have an opportunity to be heard, and an official written record of evidence is required. Liquor Control Act of 1934, 235 Ill. Comp. Stat. 5/7-5. The Act also provides additional procedural safeguards, including additional hearings and appeals. *Id*.; 235 Ill. Comp. Stat. 5/7-9; see also *Killinger*, 389 F.3d at 770 (holding that local liquor commissioner was entitled to absolute immunity for actions in suspending license). The Act also allows emergency suspensions of up to seven days without a prior hearing but provides for expedited hearings to contest them. 235 Ill. Comp. Stat. 5/7-5.

License renewal does not provide comparable procedural protections. The Act provides that a license holder may renew a license at its expiration, "provided he is then qualified to receive a license and the premises for which such renewal license is sought are suitable for such purpose." 235 Ill. Comp. Stat. 5/6-1. The Act also gives the local liquor commissioner the right to investigate any applicant for a local license renewal, including examining the applicant's books and records and taking testimony and evidence. 235 Ill. Comp. Stat. 5/4-5. However, the local application for Bridgeport renewal applicants is a one-page, tick-the-box form, and Agent Mendenhall

testified that approval was virtually "automatic." Most important for our purposes, the Act does not grant a right to notice and a hearing in the event of a planned or actual decision not to renew, nor does the Act require the commissioner to state for the record any reasons for denying renewal. The licensee has the right to appeal a denial to the state Commission, the filing of which allows the licensee to continue its operations. See 235 Ill. Comp. Stat. 5/7-9. Such an appeal is quite different from an appeal of a revocation or suspension, either of which would require notice, a hearing, a record, and a reasoned decision.[7]

In this case, Brunson submitted the *pro forma* application for renewal three weeks before his license was set to expire. Although the local ordinance required Schauf to review the application within 15 days, he sat on it for seven weeks, forcing Brunson to close his store. By simply not acting, Schauf made it difficult for Brunson to appeal, which is a key safeguard against unlawful or unconstitutional acts. With no other recourse available to him, Brunson sought the aid of hired counsel and the state Commission. Only because

---

[7] The Act also provides: "Notwithstanding any other provision of this Section to the contrary, the mayor of a city with a population of 55,000 or less … that has an interest in the manufacture, sale, or distribution of alcoholic liquor must direct the council or board over which he or she presides to appoint, by majority vote, a person other than him or her to serve as the local liquor control commissioner." 235 Ill. Comp. Stat. 5/4-2. This provision may be relevant to Brunson's argument that Schauf violated the statute by holding, directly or indirectly, interests in liquor sales in Bridgeport.

Brunson independently solicited the aid of the state Commission was he able to reopen his store with the involvement of Agent Mendenhall.

*Cleavinger* offers a guide to assessing the relative importance of these facts and statutory characteristics. 474 U.S. at 201–02. Our functional analysis of the immunity issue is aided by the six factors "characteristic of the judicial process" set out in the decision, which are "to be considered in determining absolute as contrasted with qualified immunity":

(a) the need to assure that the individual can perform his functions without harassment or intimidation;

(b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct;

(c) insulation from political influence;

(d) the importance of precedent;

(e) the adversary nature of the process; and

(f) the correctability of error on appeal.

*Id*. at 202, citing *Butz*, 438 U.S. at 512.

These factors weigh decisively against absolute immunity for an Illinois local liquor commissioner's action on whether to renew a liquor license. First, while the risk of harassment may be substantial when a local liquor commissioner makes decisions to suspend or revoke licenses, the risk of harassment is minimal where the decision to renew is "automatic" and "not discretionary." Second, while there are substantial procedural safeguards available in cases of suspensions or revocations, including notice, a prompt public hearing on an official record, and a reasoned written decision, see 235 Ill.

Comp. Stat. 5/7-5, those protections do not apply to actions on license renewals. Third, unlike many judges, the local liquor commissioner is an elected mayor, not insulated at all from political influence, though that factor applies equally to any of the official's actions. See 235 Ill. Comp. Stat. 5/4-2. Fourth and fifth, we have no indication that precedent is important in the administrative renewal process, nor is the process adversarial or even based on a record of evidence.

The sixth and only factor that tends to support absolute immunity is that errors can be corrected on appeal to the state Commission. That factor is limited to some extent, however, because in the case of inaction on a license renewal, the appellant must show there is a local commissioner's "order or action … having the effect of … denying a renewal application." 235 Ill. Comp. Stat. 5/7-9. When the local commissioner simply refuses to act, as Mayor Schauf did here, the inaction poses a further challenge to effective review.

We have applied absolute immunity under federal law only when the official's duties "are functionally comparable to those of a judicial officer." *Tobin for Governor v. Illinois State Bd. of Elections*, 268 F.3d 517, 521 (7th Cir. 2001), citing *Butz*, 438 U.S. at 512–13; see also *id.* at 526 (absolute immunity for election board members when "they rule on the validity of nomination petitions"); *Capra v. Cook County Bd. of Review*, 733 F.3d 705, 709–10 (7th Cir. 2013) (absolute immunity for members of county board of review for property tax appeals); *Heyde v. Pittenger*, 633 F.3d 512, 518 (7th Cir. 2011) (absolute immunity for members of a county board of review for quasi-judicial functions, which required notice, a hearing, and otherwise engaging in a judicial proceeding); *Wilson v. Kelkhoff*,

86 F.3d 1438, 1444 (7th Cir. 1996) (absolute immunity for members of parole board when they "grant, deny, or revoke parole," quoting *Walrath v. United States*, 35 F.3d 277, 281 (7th Cir. 1994)).

However, where an official's actions "do not involve acts that are analogous to those performed by judges," we have rejected absolute immunity defenses. *Dawson v. Newman*, 419 F.3d 656, 662 (7th Cir. 2005) (no absolute immunity for parole officers' actions involving "day-to-day duties in the supervision of a parolee"); *Snyder v. Nolen*, 380 F.3d 279, 288–89 (7th Cir. 2004) (no absolute immunity for clerks of court whose duty to "maintain the official record was purely ministerial," involving "none of the discretion that … is at the heart of absolute judicial immunity"); *Richman v. Sheahan*, 270 F.3d 430, 438 (7th Cir. 2001) (no absolute immunity for sheriffs or deputies whose misconduct involved "the manner in which they enforced the judge's order," which is an "executive, not judicial, function"); *Auriemma v. Montgomery*, 860 F.2d 273, 278–79 (7th Cir. 1988) (no absolute immunity for extra-judicial, pretrial investigations by government attorneys; absolute immunity available "only when such activities are intimately associated with the court-related duties"). See also *Cleavinger*, 474 U.S. at 201–02, 206 (no absolute immunity for members of prison disciplinary committee).

The *Cleavinger* factors thus weigh heavily against extending absolute immunity to an Illinois local liquor commissioner's actions on whether to renew a license, even while they weigh in favor of absolute immunity for decisions to revoke or suspend licenses. Denying absolute immunity runs contrary to one holding in a pre-*Cleavinger* case, which was repeated in *dicta* more recently. We therefore find it necessary

to overrule one holding in *Reed v. Village of Shorewood* and to disapprove one phrase of *dictum* in *Killinger v. Johnson*.

To explain, in 1983 in *Reed*, we faced allegations of a pattern of official harassment of a liquor licensee similar to the harassment of Brunson in this case. The harassment in *Reed* included harassment of customers and groundless suspensions of the license, and eventually included denial of license renewal. 704 F.2d at 947–48. We reversed in part the dismissal of the licensee's due process claim, holding first and foremost that an Illinois liquor license is a property interest within the meaning of the due process clause. *Id*. at 949. We also held that the local liquor commissioner was entitled to absolute quasi-judicial immunity for his actions in suspending and revoking the license. *Id*. at 951–52. We agree with those holdings, which are consistent with the later Supreme Court decision in *Cleavinger*.

In *Reed* we also extended that absolute immunity to actions to renew or deny renewal of a license. We reasoned that even though the Illinois statute did not prescribe the same procedural protections for denials of license renewals that it does for suspensions and revocations, Illinois case law required those procedures. *Id*. at 948–49, citing *City of Wyoming v. Liquor Control Comm'n of Illinois*, 362 N.E.2d 1080, 1084 (Ill. App. 1977). We also read the Act as suggesting "that the Illinois legislature expected most licenses to be renewed as a matter of course." *Reed*, 704 F.2d at 948–49.

More recently, in *Killinger* we considered a similar due process claim based on two relatively brief suspensions of a liquor license, including one summary suspension. We followed *Reed* to hold that the local liquor commissioner was en-

titled to absolute immunity on those claims based on the suspensions. 389 F.3d at 770. We repeated the *Reed* holding that absolute immunity applied to decisions "to *renew* or revoke a liquor license," *id*. (emphasis added), though strictly speaking the reference to renewal was *dictum* in *Killinger*, which presented no issue involving license renewals.

In this appeal, we invited the parties to file supplemental briefs on whether the absolute immunity holding of *Reed* and the *dictum* of *Killinger* on license renewals should be revisited. The principles of *stare decisis* demand that we give significant weight to our prior decisions unless supervening developments arise. See, e.g., *Grandberry v. Keever*, 735 F.3d 616, 617 (7th Cir. 2013); *McClain v. Retail Food Employers Joint Pension Plan*, 413 F.3d 582, 586 (7th Cir. 2005). While recognizing the importance of *stare decisis* in general, we conclude that we must narrow the *Reed* holding and disagree with the *dictum* in *Killinger*. We must deny absolute immunity to local liquor commissioners in decisions to renew licenses. We take this step based on developments in both federal and state law.[8]

The principal development in federal law is the Supreme Court's decision in *Cleavinger*, which laid out the factors discussed above for deciding when the rare grant of absolute immunity is *required*. See also *Harlow v. Fitzgerald*, 457 U.S. 800, 807–08 (1982) (qualified immunity is the norm; absolute immunity is appropriate only when public policy so requires); *Saxner v. Benson*, 727 F.2d 669, 675 (7th Cir. 1984) (Cudahy, J., concurring), *aff'd sub nom. Cleavinger*, 474 U.S. 193. *Cleavinger*

---

[8] Because we overrule one holding in *Reed*, we have circulated this opinion to all active judges under Circuit Rule 40(e). No active judge voted to hear this case en banc.

was decided after *Reed* and was not cited in *Killinger*, which in any event did not need to address whether absolute immunity should apply to decisions whether to renew licenses.

The developments in Illinois state law are two-fold. First, recently an Illinois appellate decision has rejected the *City of Wyoming* holding that "nonrenewal is equivalent to a revocation or suspension." *Knoob Enterprises, Inc. v. City of Carbondale*, 948 N.E.2d 183, 186 (Ill. App. 2011). The court in *Knoob Enterprises* found that the Act unambiguously distinguished between the procedures for renewals and the procedures for revocations and suspensions. *Id.* at 186–87. In the case, a liquor licensee appealed the non-renewal of its license. The decision turned on whether the licensee was appealing a suspension or revocation on one hand or a non-renewal on the other. The local government relied on *City of Wyoming* to argue that there was no difference, and the appellate court rejected that view, explaining that *City of Wyoming* "gives no reason to depart from the plain language of the Act." *Id.* at 186.

While it might be possible to treat *Knoob Enterprises* as an inconclusive decision by another district of the Appellate Court of Illinois, the opinion also pointed out that the Illinois legislature had responded to *City of Wyoming.* It did so with a statutory amendment to allow appeals of actions "having the effect of … denying a renewal application," but without imposing the sorts of procedural requirements that apply to local liquor commissioners' decisions to suspend or revoke licenses. 948 N.E.2d at 186–87, quoting Pub. Act 86–1279, § 1 (1991). That limited legislative response—to allow appeals of non-renewals but without requiring the procedures critical to absolute immunity—persuades us that *Reed*'s view of Illinois

law on this point is no longer viable, however sensible it might have been.

Accordingly, the combination of *Cleavinger*, the Illinois legislative response to *City of Wyoming*, and the more recent decision in *Knoob Enterprises* convinces us that the key assumption in *Reed* concerning non-renewals no longer applies. Absolute immunity should no longer apply to non-renewal decisions, which lack the hallmarks of a judicial act. Schauf has not claimed qualified immunity, which would not apply in any event if Brunson can prove his claims on the merits. We reverse the district court's grant of absolute immunity to Schauf on the due process claim.

## VI. *Remaining Due Process Issues*

### A. *City of Bridgeport*

We affirm the district court's grant of summary judgment to the City of Bridgeport on the due process claim. The city is liable for Schauf's actions only insofar as its municipal policy caused a constitutional violation. *Killinger*, 389 F.3d at 771, citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690 (1978). The district court rejected Brunson's argument that the city was liable on the due process claim for Schauf's actions as a final policymaker for Bridgeport. The court's conclusion might well raise an eyebrow, see *Reed*, 704 F.2d at 953 (official acts of municipal officials are acts of the municipality for purposes of § 1983 liability, even if official is entitled to immunity from individual liability), but Brunson has waived the point by not arguing it on appeal.

Brunson instead hints briefly at an alternative theory of due process liability for the city and the other defendants: that the overall campaign of harassment deprived him of the value

of his liquor license. See *id.*, at 949. But Brunson provides only an underdeveloped argument, so that issue is also waived. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).

B.  *Defendants' Parratt Defense to Due Process Claim*

Defendants suggest that we affirm summary judgment on Brunson's due process claim based on *Parratt v. Taylor*, 451 U.S. 527 (1981). *Parratt* held that a claim under § 1983 for deprivation of property without prior notice and an opportunity for hearing fails where the property deprivation is the result of random and unauthorized acts by state officials and where a meaningful post-deprivation remedy is available. See *Easter House v. Felder*, 910 F.2d 1387, 1396 (7th Cir. 1990), citing *Hudson v. Palmer*, 468 U.S. 517 (1984). The district court did not consider this argument in granting summary judgment to defendants. We decline to affirm summary judgment on this basis. Defendants have presented us with only black letter law of the *Parratt* line of cases. They have not shown how that narrow exception would apply to the circumstances of this case.[9]

---

[9] We are skeptical in any event. *Parratt* is a rare exception to due process norms. See *Parratt*, 451 U.S. 527 (1981); *Hudson v. Palmer*, 468 U.S. 517 (1984). It is "limited to a narrow category of due process cases where the plaintiff claims he was denied a meaningful pre-deprivation hearing, but under circumstances where the very notion of a pre-deprivation hearing would be impractical and even nonsensical, and where the deprivation was not carried out through established state procedures." *Armstrong v. Daily*, 786 F.3d 529, 539 (7th Cir. 2015). The procedures to protect Brunson's property interest in his liquor license were available and well-established. A deliberate decision to prevent him from using those procedures does not fit within the narrow *Parratt* doctrine, and certainly not where there is no obvious and sufficient post-deprivation remedy available under state law.

VII.    *Supplemental Jurisdiction*

Finally, the district court declined to exercise supplemental jurisdiction over Brunson's state-law claims because it had dismissed all of the federal claims over which it had original jurisdiction. See 28 U.S.C. § 1367(c)(3). Because we reinstate some of Brunson's federal claims under § 1983, the district court will need to revisit the question of supplemental jurisdiction on remand. See *McCullah v. Gadert*, 344 F.3d 655, 662 (7th Cir. 2003).

* * *

To recapitulate, summary judgment for Wade on the basis of prosecutorial immunity and summary judgment as to all defendants on Brunson's false arrest claim are AFFIRMED. Summary judgment in favor of defendants Schauf, Murray, and the City of Bridgeport on Brunson's claim for denial of equal protection is REVERSED. Summary judgment on Brunson's claim of denial of due process is also REVERSED as to defendants Schauf and Murray, but AFFIRMED as to defendant City of Bridgeport. The case is REMANDED to the district court for further proceedings consistent with this opinion.