In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-1521

JANE DOE NO. 55,

*Plaintiff-Appellant,*

*v.*

MADISON METROPOLITAN SCHOOL DISTRICT,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:15-cv-00570-bbc — **Barbara B. Crabb**, *Judge.*

ARGUED NOVEMBER 30, 2017 — DECIDED JULY 26, 2018

Before EASTERBROOK and MANION, *Circuit Judges*, and
LEE, *District Judge.*\*

LEE, *District Judge.* The allegations in this case are troubling, to say the least. The appellant, Jane Doe, claims that she was sexually assaulted by a security guard at her middle school while she was in eighth grade. Seeking redress, she

---

\* Of the Northern District of Illinois, sitting by designation.

filed suit against the Madison Metropolitan School District under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a). To obtain damages against the school district, Doe was required to prove, among other things, that a school official had actual knowledge of the alleged conduct. The question in this case is whether a reasonable jury could have found, based upon the summary judgment record, that the principal at Doe's middle school had actual knowledge of the security guard's misconduct. The district court thought not and granted summary judgment in the school district's favor. We affirm.

## I. BACKGROUND

Jane Doe attended Whitehorse Middle School in the Madison Metropolitan School District from 2011 to 2014. During that time, Willie Collins was a security assistant at Whitehorse. In that capacity, Collins supervised lunch and recess, oversaw students in detention, and monitored the school for safety and security.

Deborah Ptak was the principal of Whitehorse, and she supervised the entire staff, including Collins. Collins was a larger-than-life presence at the school. Ptak was aware that Collins had been a mentor and confidant to many students. She regularly saw Collins hugging male and female students and observed that most of the hugs were student-initiated.

On a few occasions while Doe was in seventh grade, Ptak saw Collins walk up behind Doe as she was seated at a table in the cafeteria and rub the top of her shoulders with his hands. Collins had not singled Doe out in this regard, however, as he engaged in similar physical contact with many students, boys and girls alike.

Tracy Warnecke, the school's positive behavioral support coach, told Ptak in the spring of 2013 that she was concerned after seeing Doe frequently seek out Collins, initiate hugs with Collins, and sometimes jump and hang onto him. Warnecke informed Ptak that, on one occasion, she saw Doe jump on Collins and kiss him on the cheek. Warnecke did note that when Doe attempted to kiss Collins again, he rebuffed her and spoke to Doe privately. After that, Warnecke did not see Doe attempt to kiss Collins again. At the end of the conversation, Ptak told Warnecke that she would follow up with Collins about Warnecke's concerns.

Around that time, Mary McAuliffe, the school's counselor, notified Ptak that she and Brooke Gritt, one of Doe's teachers, echoed Warnecke's concerns based on their own observations. McAuliffe told Ptak that she and Gritt had seen Collins give Doe a shoulder rub and had seen Doe look for Collins, hug him, jump and hang on him, and on one occasion, attempt to kiss Collins on the cheek. Ptak told McAuliffe that she should speak with Doe and that Ptak would discuss the matter with Collins.

In addition, at a school committee meeting, Karen Wydenven, the school's psychologist, and McAuliffe spoke to Ptak and Warnecke about a group of seventh grade girls who were hanging around Collins. Ptak responded, "That's just Willie's personality, you know, because he's a coach; and you know, the kids know him."

On April 11, 2013, Ptak met with Collins to discuss the issues raised by Warnecke, McAuliffe and Gritt. Ptak expressed concern for Doe's well-being and stated that Doe could have a crush on Collins. Collins told Ptak that Doe merely had been confiding in him about her problematic relationships with her

family and peers and that he was providing her with support. Ptak cautioned Collins against hugging and physically touching Doe and told Collins to limit any such conduct. Ptak reiterated that "clear" and "strong boundaries … needed to be set" and that "hugging and her jumping on him [wa]s not appropriate." Ptak also instructed Collins to speak to Doe only in common areas when others were around.

Later that month, Gritt reported to McAuliffe that Doe had been intentionally cutting herself. That same day, McAuliffe brought up the matter with Doe, but Doe did not want to talk to McAuliffe. McAuliffe then called Doe's mother to report Doe's actions and advised Doe's mother to obtain counseling for Doe.

During their conversation, Doe's mother told McAuliffe that, after a recent family argument, Doe had run off and deleted some information from her iPad. Doe's mother added that, as a result, she had learned that Doe had been using Collins' name as her iPad password. McAuliffe mentioned to Doe's mother that Doe frequently had been hanging on Collins' arm, and that if Doe's mother believed that Doe had an unhealthy preoccupation with Collins, Doe's mother should schedule a meeting with Ptak and potentially Collins.

Shortly after McAuliffe's conversation with Doe's mother, Ptak met with McAuliffe to discuss McAuliffe's concerns about Doe, including Doe's self-harming, her problems at home and preoccupation with Collins, and the use of Collins' name as her iPad password. McAuliffe told Ptak that she had recommended that Doe's mother seek counseling for Doe. McAuliffe asked Ptak to speak with Doe's mother and Collins, and Ptak reassured McAuliffe that she would. Although it is disputed whether Ptak left a voicemail message for Doe's

mother, it is undisputed that the two never spoke about Collins. Nor is there any evidence that Doe's mother spoke to any school administrator about Collins other than her initial conversation with McAuliffe, or that Ptak spoke to Collins after this discussion with McAuliffe.

Three days after her conversation with McAuliffe, Doe's mother sent Collins an email apologizing to him for "dragging [him] into the drama" with Doe. Doe's mother stated that she was not upset with Collins and thanked him for being so kind to her daughter. The email did not request that Collins cease interacting with Doe.

A week or two later, McAuliffe reported to Ptak that Gritt had seen Collins at one of Doe's tennis matches and that he had stayed for five to ten minutes. During that brief time, Gritt had not seen any contact between Doe and Collins. McAuliffe stated she would follow up with Gritt and never raised this incident with Ptak again.

After April 2013, Ptak noticed a significant decrease in interaction between Doe and Collins. She did not see any physical contact between the two after that point.

In May 2013, McAuliffe informed Ptak and Warnecke that Doe had attempted to get out of class by saying that she needed Collins to help her with a "problem." As recounted by Warnecke, Ptak indicated to them that she had already met with Collins about setting appropriate boundaries between himself and Doe. That same month, Jaime Duckert, the school district's social worker, expressed her own concerns to Ptak that so many students were hugging Collins. But this conversation occurred upon Duckert's return from a three-month maternity leave.

Once Doe started eighth grade in the fall of 2013, Ptak was unaware of any new instances of interaction between Doe and Collins that raised concerns.[1] And, according to the school's staff, Doe was much "calmer" during eighth grade.

Then, in late August 2014, Doe told her cousin that Collins had sexually abused her while she was in eighth grade. Doe's mother learned of the abuse a short time later on Doe's first day of high school. According to Doe, Collins had made sexual comments to her, kissed her, fondled her breasts, rubbed his penis against her clothed body, and digitally penetrated her.

The Madison Police Department was notified and commenced an investigation. School district officials became aware of the allegations against Collins, and he was immediately put on a leave of absence pending the investigation.

## II. ANALYSIS

Title IX provides that "No person … shall on the basis of sex, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any education program or activity, receiving Federal financial assistance." 20 U.S.C. § 1681(a). At bottom, Title IX does not prohibit sexual harassment, but, rather, prohibits school districts from dis-

---

[1] The appellant points to surveillance recordings from May 28, 2014, to June 11, 2014, showing Collins having various interactions with female students other than Doe to establish Ptak's knowledge that Collins posed a significant risk to Doe. But appellant's counsel conceded at oral argument that it is undisputed that Ptak was unaware of the specific physical interactions depicted in the surveillance recordings.

criminating on the basis of sex in providing educational benefits. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 652 (1999).

"[A]s in cases under the Civil Rights Act of 1871, 42 U.S.C. § 1983, a school district sued in a private suit under Title IX cannot be held liable on the ground of respondeat superior for an employee's violation of the statute." *Doe v. St. Francis Sch. Dist.*, 694 F.3d 869, 870 (7th Cir. 2012) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998)). Accordingly, a Title IX plaintiff must ultimately prove that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond" in a way that "amount[s] to deliberate indifference." *Gebser*, 524 U.S. at 277, 291. To survive summary judgment, a plaintiff "must establish a genuine issue of fact as to whether an appropriate official … had (1) actual knowledge of misconduct … that created a serious risk to its students, and (2) responded with deliberate indifference to the misconduct." *Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 606 (7th Cir. 2008).

Here, the district court granted summary judgment in favor of the school district, concluding that Doe had failed to raise a genuine issue of material fact as to her assertion that Ptak had actual notice of Collin's sexual abuse. We review a grant of summary judgment *de novo*. *Brunson v. Murray*, 843 F.3d 698, 704 (7th Cir. 2016).

In *Delgado v. Stegall*, we explored the contours of Title IX's actual notice requirement. 367 F.3d 668, 672 (7th Cir. 2004), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 259 (2009). There, a former student of Western

Illinois University sued the school and a professor, claiming that the professor had sexually harassed her. *Id*. at 670. The district court granted summary judgment in favor of the school, concluding that there were no facts to support the claim that school administrators had actual knowledge of the teacher's misconduct. *Id.* In affirming the decision, we discussed the Supreme Court's holding in *Gebser* that damages are only available against a school district if "an official of the school district … has actual notice of, and is deliberately indifferent to, the teacher's misconduct" and observed a "peculiarity of the Supreme Court's formula." *Id.* at 671. "Ordinarily," we noted, "actual notice and deliberate indifference are alternative paths to proving knowledge," with deliberate indifference—like its criminal counterpart recklessness—denoting "shutting one's eyes to a risk one knows but would prefer to ignore." *Id.* at 671. Nevertheless, we concluded that "under the Supreme Court's formula, the plaintiff in a Title IX damages suit based on a teacher's behavior must prove actual knowledge of misconduct, not just actual knowledge of the risks of misconduct." *Id.* at 672.

That said, we recognized that, at times, the line between these two standards may blur. *Id.*; *see St. Francis Sch. Dist.*, 694 F.3d at 871 (noting "there is less to the conflict in standards than meets the eye, because in practice there is little difference between known and obvious, the former being a natural inference from the latter."). And, indeed, "[w]hen the cases speak of a 'known' or 'obvious' risk that makes a failure to take steps against it reckless they have in mind risks so great that they are almost certain to materialize if nothing is done." *See Delgado* 367 F.3d at 672. "[I]t is only in such cases that recklessness regarding the consequences if the risk materializes merges with intention to bring about the consequences." *Id.*

And, by way of illustration, we suggested that if a school official had knowledge that a staff member was a serial harasser, such knowledge might suffice to satisfy the Supreme Court's "actual knowledge" standard, even though the official may not have actual knowledge of the specific harassment against the complainant. *See id.*

This discussion is apropos because, in this case, it is undisputed that Ptak was unaware of Doe's allegations of sexual abuse until *after* Doe had graduated from middle school. Indeed, during Doe's eighth-grade year, when, according to Doe, the sexual abuse occurred, no teacher or staff member had reported any incidents or concerns regarding Collins and Doe to Ptak. Nor does Ptak recall seeing any physical contact between Collins and Doe during that school year.

As a result, the appellant relies on events that occurred during the *previous* school year to establish that Ptak had actual knowledge, not of Collins' abuse of Doe, but of the risk that Collins would do so. For example, appellant points out that Ptak had observed Collins hugging male and female students in the hallways and giving them brief shoulder and back rubs in the cafeteria. Ptak also knew that a group of seventh grade girls was hanging around Collins. As for Collins' interactions with Doe specifically, Ptak had observed Collins give Doe a shoulder rub a few times in the cafeteria and was aware that, on one occasion, Doe had kissed him on the cheek. Ptak also was aware that Collins had allowed Doe to hug him, as well as jump and hang on him, and that Doe had a seeming preoccupation with Collins. And, when Ptak directed Collins to set clear and strong boundaries and refrain from having any physical contact with Doe, Collins informed Ptak that

Doe had confided in him about her familial and peer relation-
ships and that he had supported her.

Although such facts certainly could have raised some con-
cern that stricter and more defined boundaries between Col-
lins and Doe might have been advisable during Doe's sev-
enth-grade year (which Ptak did impose), we agree with the
district court that a reasonable jury could not find, based on
these facts, that Ptak had actual knowledge of any sexual mis-
conduct on the part of Collins that created a serious risk to
Doe. Nor could a rational jury find that Ptak had actual
knowledge of a risk so great that harm to Doe was almost cer-
tain to materialize if nothing were done to stop it.

In this respect, our decision in *St. Francis* is instructive. In
that case, an eighth grader sued his school district under Title
IX after being sexually abused by his teacher. We affirmed
summary judgment in the school district's favor because the
student had failed to create a triable issue that the school dis-
trict superintendent had actual knowledge of the abuse. 694
F.3d at 870, 872. The superintendent was well aware that the
teacher's colleagues had complained that the teacher had
"blurred the line" by treating students as friends. *Id.* at 872.
And one of the teacher's peers told the superintendent that
the teacher and the student "had something like an eighth
grade girlfriend/boyfriend relationship, like a crush." But no
facts were offered to support these suspicions, and when
questioned by the superintendent, the fellow teacher denied
that the teacher was doing anything "illegal." *Id.* The teacher
herself also denied any impropriety when confronted by the
superintendent, and the superintendent found her denial to
be sincere. *Id.* Indeed, school officials did not find out about
the relationship between the teacher and the student until the

student's mother discovered text messages from the teacher on her son's phone. *Id.* Such facts, we concluded, were insufficient to establish actual notice because even if the principal and superintendent knew that the teacher's colleagues suspected an improper relationship between her and the student, "to know that someone suspects something is not to know the something and does not mean the something is obvious." *Id.*

The facts of this case are on par with those in *St. Francis*. Here, Ptak observed Collins hugging male and female students, giving male and female students shoulder rubs in the cafeteria, permitting Doe to kiss him on the cheek on one occasion, and playing the role of mentor and confidant to Doe and other students. Certain staff members also expressed misgivings about Doe's seeming preoccupation with Collins. Such facts may have raised (and, in fact, did raise) cautionary flags, but they are insufficient to bestow upon Ptak actual knowledge that Collins was engaging in sexual misconduct at the time or that there was an almost certain risk that he would do so in the future.

What is more, it is worth iterating that things appeared to have calmed down during the late spring of Doe's seventh-grade year. Ptak did not recall seeing any physical contact between Doe and Collins after that point. And to the extent that others did, they did not report anything to Ptak.

For these reasons, the district court properly determined that a trial was unwarranted because no reasonable jury could find that Ptak possessed actual knowledge of misconduct that created a serious risk of harm to Doe. And because the absence of a genuine issue in this regard is dispositive, we need

not reach the other issues raised on appeal.[2] The district court's decision is AFFIRMED.

---

[2] Doe's lawyer declined an opportunity at oral argument to present facts in the record to show that Doe had been denied equal access to education. *See Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003) (citing *Davis*, 526 U.S. at 652) ("[A]n action under Title IX lies only where the behavior at issue denies a victim equal access to education."). Because we affirm on a different ground, we need not consider Doe's contention that a denial of equal access to education should be presumed in the case of staff-student sexual harassment.