In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 18-1605

REX A. FREDERICKSON,

*Plaintiff-Appellee,*

*v.*

TIZOC LANDEROS, DETECTIVE,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 3484 — **Thomas M. Durkin**, *Judge.*

———————————

ARGUED NOVEMBER 6, 2018 — DECIDED NOVEMBER 26, 2019

———————————

Before WOOD, *Chief Judge*, and EASTERBROOK and KANNE,
*Circuit Judges*.

WOOD, *Chief Judge*. The Equal Protection Clause of the
Fourteenth Amendment requires that state actors have, at a
minimum, a rational basis for treating similarly situated peo-
ple differently. Rex Frederickson alleges that Officer Tizoc
Landeros prevented him from updating his Illinois sexual of-
fender registration and otherwise used his official position to
harass Frederickson purely out of personal dislike. Without

an updated registration, Frederickson was unable to move from Joliet, Illinois, to nearby Bolingbrook.

The district court found that Frederickson had put forth enough evidence to allow a jury to find that Landeros had singled Frederickson out for unfavorable treatment, and that in so doing Landeros was motivated solely by personal animus and thus lacked a rational basis for his actions. *Frederickson v. Landeros,* No. 11 C 3484, 2018 WL 1184730 (N.D. Ill. March 7, 2018). The district court also held, relying on our decision in *Hanes v. Zurick,* 578 F.3d 491, 496 (7th Cir. 2009), that "Frederickson's equal protection right to 'police protection uncorrupted by personal animus' [was] clearly established." 2018 WL 1184730 at *8 (quoting from *Hanes*). Relying on these two conclusions, the district court denied Landeros's motion for summary judgment based on qualified immunity as it applied to Frederickson's equal protection theory. It also found that Landeros was entitled to qualified immunity on Frederickson's theories based on a substantive due process right to intrastate travel and an alleged procedural due process right to register under the Illinois sex offender legislation. Frederickson did not cross-appeal from the latter two findings, and so we need not address them. Landeros filed a timely appeal from the partial denial of qualified immunity. We conclude that the district court's order must be affirmed.

## I

Because this case comes to us on an interlocutory appeal from a denial of qualified immunity, we must accept the plaintiff's version of the facts. *Gant v. Hartman*, 924 F.3d 445, 448 (7th Cir. 2019), relying on *Johnson v. Jones*, 515 U.S. 304 (1995). The account that follows reflects that favorable assumption, not any findings of our own.

In 2011, Frederickson lived in Joliet, Illinois. He was homeless, and he had a prior conviction for a sex crime. That combination meant that he had (and has) to comply with strict registration requirements under the Illinois Sexual Offender Registration Act ("SORA"). Chief among those requirements is SORA's mandate that he report and register every week with the law enforcement agency for the jurisdiction in which he resides. 730 ILCS 150/6; 730 ILCS 150/3(a). As part of that process, he must provide certain information, including his work address and where he had stayed over the past seven days. If he wishes to move to a different jurisdiction, additional rules apply. The City of Joliet interprets SORA to require that a person in Frederickson's position take two distinct steps: (1) register with the new jurisdiction, and (2) "register out" of the old jurisdiction. Both, it says, must be done within three days. See 730 ILCS 150/6.

Frederickson's understanding of the system is that the law requires only the first of those actions, but we do not need to resolve this question of state law. No one disputes that if Illinois wanted to enact a requirement to "register out," it could do so. For present purposes, we can assume without deciding that SORA requires notice of exit on an ongoing basis for a homeless person (rather than only when the person first loses a fixed residence, see 730 ILCS 150/6). The issue before us concerns only Frederickson's claim that Detective Landeros violated his federal rights, not whether Landeros was misinterpreting a state law. We therefore turn directly to qualified immunity.

For the first four years during which Frederickson lived in Joliet, Detective Moises Avila registered Frederickson and everything went smoothly. In 2007 Detective Landeros took

over Joliet's SORA registrations—a post he held throughout the period at issue here. Frederickson interacted with Landeros every week when he updated his SORA registration.

Frederickson's compliance with the SORA registration requirements, while dutiful, was begrudging. To Landeros's annoyance, Frederickson often questioned the constitutionality of the registration requirement. He also requested seemingly small—indeed, trivial in Landeros's opinion—changes to his registration. For example, Frederickson regularly asked Landeros to specify that Frederickson was not an *employee* of Greg's Body Shop, but instead that he was an independent contractor for that shop's owner, Greg Buccarelli. Matters became so contentious that Frederickson began bringing witnesses to some of his weekly registrations. One witness purportedly observed Landeros saying that "of all the people I register, why are you the only one I have trouble with[?]" Frederickson testified that Landeros often repeated variations on this refrain.

Over the years, Landeros arrested Frederickson several times. In 2008, he arrested Frederickson for failure to register under SORA. Although Frederickson ultimately was acquitted on that charge, he spent a year in jail before it was resolved. In November 2010 Landeros arrested Frederickson for driving on a suspended license. Frederickson pleaded guilty to this charge, although he asserts that he did so only because his plea allowed him to get out of jail. Critically, despite the emphasis that the dissent puts on these arrests, Frederickson does not challenge his guilty plea or conviction in this lawsuit. We agree that under *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019), they cannot be challenged if supported by probable cause, and we assume that they were so supported.

Frederickson points instead to independent evidence that, he believes, is relevant to his equal protection claim. On January 26, 2011, Frederickson informed Landeros that he had decided to leave Joliet. Landeros did not take well to the news: he threatened to arrest Frederickson (on unclear grounds and with no hint of probable cause) if Frederickson relocated. Despite this threat, Frederickson moved to Bolingbrook, Illinois, on February 8, 2011, to take a job with J&J Autobody. On February 9—a day after the move and a week after his last registration—Frederickson registered with the Bolingbrook Police Department. Bolingbrook accepted the registration. Landeros believed that the move also triggered a requirement under SORA for Frederickson to "register out" of Joliet. But Frederickson alleges that Illinois jurisdictions regularly waive notice of exit—a fact that is relevant to what happened next.

After Bolingbrook registered Frederickson, it had to update his record in Illinois's Law Enforcement Agency Data System ("LEADS") database. To do that Bolingbrook needed Frederickson's LEADS file. But only one law enforcement agency can "own" a LEADS file at a time, and only the agency that owns the file can update it. That meant that Joliet had to transfer Frederickson's file to Bolingbrook before the latter town could make the necessary change. When the Bolingbrook records clerk, Nicole Wlodarski, called Joliet, the person to whom she spoke refused to transfer Frederickson's LEADS file. That person stated that "they knew [Frederickson] was still living in Joliet," and that his residence was "under investigation." This was the only time that Wlodarski could remember a jurisdiction's refusing to transfer a LEADS file. Sean Talbot, a Bolingbrook detective, and Diane Kloepfer, a Bolingbrook administrator responsible for LEADS files for

"most of" 19 years, also testified that they could not remember a jurisdiction ever refusing a file transfer. This incident had nothing to do with an arrest and thus did not trigger the *Nieves* rule.

Landeros then spoke to Detective Talbot about Frederickson. Landeros told Talbot that Frederickson was trying to "pull the wool over [Bolingbrook's] eyes" and that Frederickson was not actually residing in Bolingbrook. After this conversation, several emails were circulated within the Bolingbrook Police Department instructing the recipients not to accept Frederickson's SORA registration because "he lives in Joliet [*sic*] he is not homeless."

After his initial registration in Bolingbrook on February 9, Frederickson worked in Bolingbrook for most of the next week while attempting to move his belongings from Joliet to Bolingbrook. On February 16, Frederickson again had to register. Once again, thanks to Landeros's intervention, he had problems doing so. That morning Frederickson was in Joliet picking up his tools, but he did not know whether he would be able to get a ride to Bolingbrook later that day. Because the 16th was his required registration day, just to be safe Frederickson registered in Joliet that morning. But Frederickson managed to get a ride to Bolingbrook that afternoon, and so, based on his intent to remain and work in Bolingbrook for the coming week, he went to the Bolingbrook police station to register. The Bolingbrook police officer with whom Frederickson spoke refused to register him and ordered him to go back to Joliet. Despite this refusal, Frederickson resided in Bolingbrook for the next week, living in a truck parked there.

Frederickson tried to register in Bolingbrook again on February 23, but his registration was again refused. This time Detective Talbot and another Bolingbrook detective told Frederickson that if he wanted to register he had to list the locations where he planned on staying over the next week. (No one has ever suggested a source for this requirement, and we cannot find it either in Illinois law, Bolingbrook ordinances, or any municipal policy.) Frederickson refused to comply with this additional hurdle, and so the Bolingbrook detectives ordered him to return to Joliet. Frederickson responded by going to the Bolingbrook Village Hall to file a complaint against the two detectives. But while he was there, the village clerk received a call instructing her to refuse to help with—even to accept—Frederickson's complaint. Shortly after that, several Bolingbrook police officers entered the Village Hall and removed Frederickson from the premises before he could complete his complaint.

Because of his registration troubles, Frederickson quit his job in Bolingbrook and went back to Joliet. On February 28, and March 1, 2, and 3 Frederickson went to the Joliet Police Department. According to Frederickson, at least some of these trips were attempts to register, and he was spurned each time. Joliet Detective Scarpetta admits that he refused on February 28 to take Frederickson's registration, instead requiring him to come back two days later. Critically, Frederickson did not successfully complete his registration on March 2 as SORA required. For that omission, Frederickson was indicted with failing to register "on or about March 3, 2011." *People v. Frederickson*, 2014 Il App (3d) 110733-U, ¶ 36 (Ill. Ct. App. 2014). Frederickson was convicted for failing to register by that date; the conviction was upheld on appeal. Once again, Frederickson does not attempt to undermine either the facts underlying

this conviction or the conviction itself. As the Appellate Court of Illinois recognized, "[e]ven assuming [Frederickson's] attempts to register in Bolingbrook on February 23 were improperly rebuked, it is undisputed that as of March 3, 2011, [Frederickson] had not registered as required by" SORA. *Id.* at ¶ 38. But this case is *not* about the March 2 events. Here, Frederickson is challenging Landeros's actions *before* that time.

## II

We review the district court's denial of qualified immunity *de novo*. *Estate of Clark v. Walker*, 865 F.3d 544, 549 (7th Cir. 2017). We ask whether, when viewed in the light most favorable to Frederickson, the facts show a violation of a constitutional right, and if so, whether that constitutional right was clearly established at the time of the alleged violation, in the context presented by the case. *Id.* at 550.

We do not conduct this analysis in a vacuum. We must instead define carefully, and at the right level of detail, the constitutional right that is at issue. In that connection, we do not know why the dissent has chosen to postulate various constitutional claims that Frederickson is *not* raising—claims based on the First Amendment, *post* at 24, or the Fourth Amendment, *post* at 25, or the Due Process Clause of the Fourteenth Amendment, *id.* The dissent comes closer to Frederickson's actual allegation when it turns to the Equal Protection Clause of the Fourteenth Amendment, *post* at 26–28, but only when it finally turns to the class-of-one theory does it finally hit the mark. Surely if qualified immunity law requires careful definition of the asserted claim, at the correct level of generality, see *White v. Pauly*, 137 S. Ct. 548, 552 (2017), citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), then it cannot be assessed

based on hypothetical claims that are not presented in the case.

We thus look exclusively at the class-of-one equal protection theory, which is the only one that Frederickson has preserved. "The classic class-of-one claim is illustrated when a public official, 'with no conceivable basis for his action other than spite or some other improper motive … comes down hard on a hapless private citizen.'" *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) (quoting *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005)). While the outer bounds of class-of-one equal protection claims have been the subject of much debate, see *Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887 (7th Cir. 2012) (*en banc*) (affirmed by an equally divided court), some things are established. In 2000 the Supreme Court held that it recognizes "successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The *Olech* complaint also alleged that the Village was acting out of spite, but the Court chose not to reach the "subjective ill will" theory. *Id.* at 565.

*Olech* therefore defines the inquiry that we must conduct: has the plaintiff (Frederickson) adequately alleged that the state actor (Landeros) intentionally discriminated against him without any rational basis for this differential treatment. And more particularly, we must consider not (as the dissent characterizes it, *post* at 24) whether Landeros had any duty to *facilitate* Frederickson's effort to transfer his registration to Bolingbrook; we must consider whether Landeros was entitled to

erect extra-legal barriers designed to *prevent* Frederickson's compliance with the law.

Despite the parade of horribles that the dissent fears, *post* at 28, it is not so easy to file a complaint that complies with *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), if *Olech* supplies the theory of the case. The plaintiff must present a set of facts that plausibly depict official action utterly unsupported by a rational basis. As the Supreme Court noted in a case dealing with local economic regulation, for purposes of the rational-basis test "it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment." *City of New Orleans v. Dukes*, 427 U.S. 297, 303–04 (1976).

Taking *Dukes* as a guide, we have recognized that a party may allege that this type of "invidious" action—wholly arbitrary, inconsistent with the Fourteenth Amendment—is the only factor distinguishing the target from the rest of the population, and that such a showing suffices to prove the lack of a rational basis. See *Hanes*, 578 F.3d at 496; *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012) ("[C]lass-of-one claims can be brought based on allegations of the irrational or malicious application of law enforcement powers."); see also *Esmail v. Macrane*, 53 F.3d 176, 178–80 (7th Cir. 1995) (holding that when "action taken by the state, whether in the form of prosecution or otherwise, was a spiteful effort to 'get' [the plaintiff] for reasons *wholly unrelated to any legitimate state objective*" that action violated the Equal Protection Clause (emphasis added)). With that in mind, we turn to the question whether a trier of fact could find that there was no rational basis for Landeros's treatment of Frederickson.

A

Landeros's actions occurred in 2011, and so the first question we must address is whether the right Frederickson is trying to vindicate was clearly established before then. *Olech* was decided in 2000, well before Landeros acted, and this court had recognized class-of-one claims long before *Olech*. See, *e.g.*, *Esmail*, 53 F.3d at 178 (7th Cir. 1995); *Ciechon v. City of Chicago*, 686 F.2d 511, 522–23 (7th Cir. 1982) (finding an equal protection violation when plaintiff was fired but her similarly situated co-worker was not and there was "no rational basis for such discrimination"). Importantly, this case does not involve state employment, and so it is unaffected by the Supreme Court's recognition in *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008), that the class-of-one theory is not cognizable in public employment cases. *Id.* at 605.

Bearing in mind the relation between the lack of a rational basis in general, and actions taken solely on the basis of animus in particular, we have consistently stated that a class-of-one plaintiff's "right to police protection uncorrupted by personal animus" is clearly established. See *Hanes*, 578 F.3d at 496–97 (finding in 2009 that this right was established by *Hilton v. City of Wheeling*, 209 F.3d 1005 (7th Cir. 2000)). Indeed, *Hilton* suggests that the right to even-handed police protection may have been established long before that case was decided. 209 F.3d at 1007 (citing numerous cases including *Esmail*, 53 F.3d 176, and *Ciechon*, 686 F.2d 511).

Let's assume for the sake of argument, however, as the dissent urges, that *Hanes* and *Hilton* and *Geinosky* were wrong when they held that a claim is stated under *Olech* if "the police decided to withdraw all protection" from a person "out of

sheer malice," 209 F.3d at 1007, and thus that the "right to po-
lice protection uncorrupted by personal animus" states the
constitutional standard too broadly. A quick look at Freder-
ickson's complaint shows that his claim is far more particu-
larized. He is asserting that, just as in *Olech*, no rational basis
supports the police officer's action—motivated exclusively by
animus and no other discernible rational basis—to block him
from complying with an ordinary registration requirement or
from filing a complaint with Village authorities.

In order to prove this class-of-one claim, Frederickson will
eventually have to present evidence that would allow a rea-
sonable jury to conclude that in this particular respect he "has
been intentionally treated differently from others similarly
situated and that there is *no rational basis* for the difference in
treatment." *Hanes*, 578 F.3d at 494 (quoting *Olech*, 528 U.S. at
564) (emphasis added). Although we have not definitively re-
solved the question whether it is sufficient for a plaintiff
simply to allege differential treatment at the hands of the po-
lice with no rational basis, or if a class-of-one claim requires a
plaintiff *additionally* to prove that the police acted for reasons
of personal animus, malice, or some other improper personal
motivation, see *Racine Charter One, Inc. v. Racine Unified Sch.
Dist.*, 424 F.3d 677, 683–84 (7th Cir. 2005) (describing the two
lines of cases); see also *Del Marcelle*, 680 F.3d 887, whatever
uncertainty exists makes no difference to this case in its pre-
sent posture. We accept (favorably to Landeros) that the only
form of class-of-one equal protection right that is *clearly* estab-
lished within our circuit involves government actors who sin-
gle out a citizen for differential treatment with no objective
rational basis for that difference *and* because of "a vindictive
or harassing purpose." See *Geinosky*, 675 F.3d at 748 n.2;
*Hanes*, 578 F.3d at 496.

Class-of-one complaints typically allege that a defendant has either a personal financial stake or some history with the plaintiff, and that this stake or history demonstrates both the lack of a rational basis for the action and animus. In *Olech*, for example, the Olechs previously had successfully sued the Village of Willowbrook. That lawsuit generated "substantial ill will" on the part of Village officials toward the Olechs. See *Olech v. Village of Willowbrook*, 160 F.3d 386, 387–88 (7th Cir. 1998). Other examples include a defendant's attempted larceny, *Forseth v. Village of Sussex*, 199 F.3d 363, 371 (7th Cir. 2000), an attempt to use the plaintiff as a scapegoat, *Ciechon*, 686 F.2d at 524, and a classic neighborly dispute about a fence, *Swanson*, 719 F.3d at 781–82; see also *Brunson v. Murray*, 843 F.3d 698, 701–03 (7th Cir. 2016) (campaign of harassment over a liquor store); *Hanes*, 578 F.3d at 492 (long-running dispute between neighbors where, "no matter who initiated the complaint," only Hanes was arrested).

Landeros would add two additional hurdles for Frederickson to clear: first, the identification of a similarly situated comparator; and second, a demonstration that the *state* law was clear enough to give rise to a clearly established right. Neither of these extra requirements finds support in the relevant cases.

The question is not whether the identification of a similarly situated person would be *sufficient* to meet a plaintiff's burden; it is instead whether such a showing is *necessary*. Unsurprisingly, if the plaintiff and a comparator share the relevant characteristic, then differential treatment may suggest an impermissible motive. See *Geinosky*, 675 F.3d at 748 ("When the parties raise a serious question whether differences in

treatment stem from a discriminatory purpose or from a relevant factual difference, the key evidence is often what was done in the investigation or prosecution of others in similar circumstances."). Nonetheless, we have held that it is not always necessary to find a similarly situated person. See *Geinosky*, 675 F.3d at 748; *Swanson*, 719 F.3d at 784. "If animus is readily obvious, it seems redundant to require that the plaintiff show disparate treatment in a near exact, one-to-one comparison to another individual." *Swanson*, 719 F.3d at 784. We are not inclined to revisit those decisions.

The cases in which we have found the required lack of a rational basis and animus without the use of a comparator have involved plaintiffs who were subjected to arbitrary and unjustified exercises of government power. When viewing the facts in Frederickson's favor, that is what one sees in his situation. As our recitation of the facts shows, his complaint relates to the barricades that Landeros was placing in the way of his registrations (whether entry or exit), not the occasional and uncontested convictions for failure to register or driving without a valid license. No law enforcement officer involved in this case could recall similar obstruction happening in his experience. Bolingbrook officials stated that Frederickson's registration was the only one that village had ever denied. Landeros prompted city workers to spurn Frederickson's efforts to file complaints and to give him the run-around. Just as Geinosky did not need to identify another person who received twenty-four bogus parking tickets, *Geinosky*, 675 F.3d at 748, and Swanson did not need to find a neighbor equally hated by his town's mayor for building a fence next to the mayor's home, *Swanson*, 719 F.3d at 781, 784–85, Frederickson does not need to identify a homeless offender whose effort to

move to a different jurisdiction Landeros blocked for no reason at all, or out of simple invidiousness. To place that requirement on Frederickson would be to "elevate form over substance." *Geinosky*, 675 F.3d at 748. Frederickson "has identified his specific harasser, provided a plausible motive and detailed a series of alleged actions … that appear illegitimate on their face." *Swanson*, 719 F.3d at 785.

With respect to SORA's requirements, Landeros seems to be saying that he could not have known whether his activities were permissible and thus no one could infer personal animus from this record. As he puts it, "[t]here is no clearly established law making it illegal for an officer to investigate a homeless sex offender to determine whether he lives where he says he does, and then refuse to transfer a LEADS file pending the results of the investigation." But no one says that there is such a law, and that is not a fair depiction of Frederickson's claim. The question at the heart of any class-of-one case is whether the defendant arbitrarily used the powers given to him by the state to deny equal treatment to the plaintiff. Qualified immunity does not require us to catalogue every possible way that a police officer might abuse his power before finding him liable for that abuse. The point is that the state actor may not use his authority to harass or abuse someone in a way that reflects invidious discrimination or a wholly arbitrary act and that can be explained exclusively as the result of personal dislike.

Similarly, the fact that SORA is a complex statute, and that courts are only now exploring how it interacts with a registrant's due process or other constitutional rights, does not muddle the law around class-of-one equal protection claims. See, *e.g.*, *Beley v. City of Chicago*, 901 F.3d 823 (7th Cir. 2018)

(analyzing the interaction between SORA and the Due Process Clause); *Saiger v. City of Chicago*, 37 F. Supp. 3d 979, 984–86 (N.D. Ill. 2014) (same); *Derfus v. City of Chicago*, 42 F. Supp. 3d 888, 897–99 (N.D. Ill. 2014) (same).

A simple hypothetical shows why this is so, and at the same time illustrates why, contrary to the dissent's argument, *post* at 25, our decision creates no conflict with *Beley. Beley* involved the City of Chicago's alleged failure to have procedures in place to allow homeless offenders to register. See *Beley*, 901 F.3d at 824. In that case we held that SORA registrants have no liberty interest in registering under SORA, and thus the Due Process Clause provides them no protection. *Id.* at 826–28. Although *Beley* had not yet been decided when the district court acted, its grant of summary judgment for Landeros on his procedural claim anticipated *Beley*'s holding. Imagine, however, that the City of Chicago registered everyone without incident except Latinos. That would obviously create an *equal protection* problem, regardless of the compatibility of the statute with due process. Or, closer to our case, imagine that the City refused to register one person against whom the Chief of Police had a personal vendetta. Again, regardless of whether the Due Process Clause is violated by the City's refusing to register that offender, the City's actions would raise the same kind of class-of-one equal protection claim we have here. In other class-of-one cases, we have recognized that an equal protection violation may have occurred even though no due process violation was present. See, *e.g.*, *Geinosky*, 675 F.3d at 750 (dismissing Geinosky's due process claim); *Esmail*, 53 F.3d at 180 (distinguishing due process claims from a class-of-one equal protection claim because the latter "does not require proof of a deprivation of life, liberty, or property"). We

thus conclude that Frederickson's right to register as a sex of-
fender or to file complaints with the local authorities without
being blocked by a police officer who acts exclusively out of
animus was clearly established at the time of these events.

B

This brings us to the second part of the qualified-immun-
ity analysis: whether the facts Frederickson has asserted de-
scribe a violation of the Equal Protection Clause and suffice to
defeat summary judgment. We agree with the district court
that the answer is yes. Frederickson has introduced evidence
that would allow a jury to find both that Landeros had no ob-
jective rational basis to prevent his move to Bolingbrook, and
that Landeros took affirmative steps to block his move for rea-
sons of personal animus.

Landeros's actions were, according to every law enforce-
ment officer deposed (including Landeros himself), unprece-
dented and unexplainable. Despite their decades of combined
experience, no officer from Bolingbrook or Joliet could recall
a jurisdiction's ever refusing to transfer a LEADS file in any
instance other than this one. Bolingbrook's refusal to register
Frederickson and the many steps Landeros took to block
Frederickson's access to the registration machinery were sim-
ilarly extraordinary. Indeed, Bolingbrook's representative
confirmed that Frederickson was the only person that Boling-
brook had ever refused to register.

Landeros argues that despite all this, we should still dis-
cern a rational purpose for his actions: he stopped Frederick-
son's file transfer because he was in the process of investigat-
ing Frederickson's alleged move from Joliet to Bolingbrook.
But there we slip into the forbidden realm of disputed facts.

There is significant evidence undermining Landeros's explanation, and much of that evidence comes from Landeros's own testimony. Landeros testified that as a general matter, he could think of no reason to refuse to put a LEADS file into the moving status necessary to transfer it to a new jurisdiction. He also testified that it was his policy to register homeless offenders "regardless" of whether they provided accurate information. If an offender provided inaccurate information, Landeros said, he would simply arrest that person. At a minimum then, Landeros deviated from his usual policies when he took active steps to prevent Frederickson from registering in Bolingbrook. A factfinder could conclude that this is the type of departure from a "clear standard" that the Court found relevant in *Olech*. See *Engquist*, 553 U.S. at 602 (citing *Olech*, 528 U.S. at 565 (Breyer, J., concurring in result)).

Landeros also admitted that the reasons he provided to the Bolingbrook Police Department about why they should not register Frederickson may have been false. During Landeros's deposition, the following exchange occurred:

> Q: Did you have any reason to believe that Mr. Frederickson wasn't homeless in Bolingbrook?
>
> A: No, I don't.
>
> Q: And you didn't have any reason at the time?
>
> A: No.

On the second day of his deposition, Landeros reaffirmed that he had no reason to suspect Frederickson was lying about living in Bolingbrook:

Q: You previously testified on the first day of this deposition that you had no reason to believe Mr. Frederickson was not homeless in Bolingbrook, correct?

A: Correct.

At the time of the attempted file transfer, Landeros told Bolingbrook officers that Frederickson was trying to "pull the wool over [Bolingbrook's] eyes" because Frederickson "lives in Joliet" and "d[idn't] want to pay [Joliet's] mandatory fee so he is going to try and scam [Bolingbrook] into doing it." This is the type of obvious factual dispute that we cannot resolve on an interlocutory appeal. If jurors were to credit Landeros's statements during this litigation, they could conclude that his previously stated "investigatory" reasons for preventing Frederickson's registering in Bolingbrook were phony, designed only to cover up his personal dislike of Frederickson.

Beyond Landeros's own statements, there are additional reasons that suggest his explanations for stymying Frederickson's move to Bolingbrook were pretextual. As the district court noted, SORA does not obligate the police to investigate a resident's purported change of address before transferring a LEADS file. It instead requires that an investigation into an offender's provided information must occur once per year. See 730 ILCS 150/8-5. And while Landeros suggests that Frederickson's failure to "register out" of Joliet within three days of his move to Bolingbrook raised the need for an investigation, a jury could find that reason to be pretextual, in light of evidence indicating that any such exit requirement is normally waived. See 730 ILCS 150/6.

We reiterate that if Landeros merely violated state law, that would not be enough to support Frederickson's class-of-one equal protection claim. But Landeros's actions here, according to the allegations, include affirmative misconduct designed to block Frederickson's access to registration and to the ordinary complaint process. A similar problem occasionally arises in connection with the Prison Litigation Reform Act (PLRA). See, *e.g.*, *Hernandez v. Dart*, 814 F.3d 836, 842 (7th Cir. 2016) ("Administrative remedies are primarily 'unavailable' to prisoners where 'affirmative misconduct' prevents prisoners from pursuing administrative remedies."). Under the PLRA, prisoners must exhaust intra-prison administrative remedies before filing suit in federal court. *Id.* at 841. But that exhaustion requirement is excused if the intra-prison administrative procedure is "genuinely unavailable or nonexistent." *Lanaghan v. Koch*, 902 F.3d 683, 688 (7th Cir. 2018) (quoting *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016)). We consistently have held that a prison employee can make administrative remedies unavailable by engaging in affirmative misconduct, such as giving a prisoner "blank sheets of paper when he requested a grievance form." *Dale v. Lappin*, 376 F.3d 652, 656 (7th Cir. 2004); see also *Lanaghan*, 902 F.3d at 686–87, 689 (7th Cir. 2018) (grievance procedure unavailable to an inmate when guards denied him access to a table where another inmate would help him write the grievance, and the inmate had lost the physical ability to write). Just so here. Landeros may or may not have violated Illinois law, but Frederickson has put forward sufficient evidence to allow a trier of fact to find that Landeros targeted him with affirmative measures that blocked his access to the administrative registration machinery he was supposed to use.

Moreover, the district court found that there were relevant factual disputes on the question whether Frederickson had complied with the "register out" requirement, as well as whether he was attempting to evade SORA's registration requirements more generally. This interlocutory appeal is not the right vehicle for resolving those questions.

A trier of fact could find that a need to investigate was not the real reason for Landeros's decision to prevent Frederickson's registering in Bolingbrook. That fact-finder could also conclude that there was no need to investigate at all. This is important because an action withstands rational basis review so long as there is "a *conceivable* rational basis for the difference in treatment," regardless of the actual reason for differential treatment. *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013). On these facts, a jury could conclude that there was no "objectively rational basis to investigate" Frederickson's move. *Id.* Beyond the need for investigation, Landeros has put forward no conceivable rational basis for his treatment of Frederickson, and we can think of none. Frederickson has thus adduced sufficient evidence to allow a trier of fact to find that Landeros's actions lacked any rational basis.

C

As we noted earlier, the Supreme Court's opinion in *Olech* stated that a class-of-one claim rises or falls based on proof of "irrational and wholly arbitrary" government behavior. 528 U.S. at 564–65. But taking heed of the concerns Justice Breyer expressed in his *Olech* concurrence, 528 U.S. at 565–66 (Breyer, J., concurring in the result), lower courts quickly realized the need to avoid a standard under which virtually every discretionary decision by a government actor could lead to an adequately pleaded class-of-one claim. See *Hilton*, 209 F.3d at

1008. To prevent that unintended outcome and to remain faithful to the rational-basis test, we adopted a rule requiring a class-of-one plaintiff to plead and prove "that the defendant deliberately sought to deprive him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position." *Id.* Frederickson's allegations meet that formulation too.

The presence of animus is powerful evidence of potentially irrational government conduct. Government action motivated solely by personal dislike is the canonical example of "irrational and wholly arbitrary" government behavior. See *Hilton*, 209 F.3d at 1007 ("If the police decided to withdraw all protection from Hilton out of sheer malice, or because they had been bribed by his neighbors, he would state a claim under *Olech*."). So too here; the evidence Frederickson has offered of Landeros's personal dislike of him offers a plausible explanation for Landeros's otherwise potentially unexplainable behavior.

Frederickson and Landeros had a years-long and tumultuous relationship. Landeros harassed Frederickson in countless petty ways that blocked Frederickson's efforts to comply with SORA, and he threatened Frederickson with arrest, or actually arrested him, on multiple occasions. (We confess to being mystified over why Landeros cared whether Frederickson lived in Joliet or any other Illinois town; if Bolingbrook was willing to have him, he would no longer have been Landeros's problem.) If Frederickson were complaining only about arrests supported by probable cause, we freely concede that *Nieves* would require a different result. But his complaint goes well beyond that. Relations between Frederickson and

Landeros were combative. Frederickson testified that Landeros threatened to arrest him when he announced his plan to leave Joliet in 2008 and when he attempted to do so again in 2011; there is no hint of probable cause for those actions. Frederickson also stated that Landeros repeatedly refused to correct his status as an independent contractor and the name of his employer on his registration. Landeros, in turn, complained that he thought Frederickson gave him "trouble." Probable cause has nothing to do with those actions.

A jury would not be compelled to find anything nefarious about this history of interactions between a single officer and citizen—even a homeless ex-sex-offender. But our question is only whether a rational jury *could* make that finding. When combined with the series of events surrounding Frederickson's attempted move, this history would entitle a jury to conclude that Landeros acted against Frederickson for no conceivable reason other than personal animus. We therefore agree with the district court that Frederickson has presented sufficient evidence to defeat qualified immunity at this stage.

**\*\*\***

The district court's denial of qualified immunity is AFFIRMED.

EASTERBROOK, *Circuit Judge*, dissenting. Rex Frederickson, a sex offender, must register frequently in Illinois because he does not have a fixed address. He asserts in this suit under 42 U.S.C. §1983 that in 2011 Tizoc Landeros, a police officer in Joliet, refused to transfer his registration records from Joliet to Bolingbrook. The cause, Frederickson asserts, was personal antipathy (Frederickson sassed Landeros, who took offense), and the result included his arrest, conviction, and imprisonment for failing to register, as well as a reduction in his economic opportunities. Landeros asserts qualified immunity from liability in damages, which requires us to decide whether in 2011 it was "clearly established" that the Constitution required him to facilitate the transfer of Frederickson's registration from Joliet to Bolingbrook. See *Escondido v. Emmons*, 139 S. Ct. 500 (2019) (citing many other decisions).

Frederickson has many potential constitutional theories, but all have problems. Consider them in turn.

One theory would be that Landeros violated the First Amendment (applied to the states through the Fourteenth) by taking adverse actions to penalize Frederickson's speech. The problem with this approach is that "retaliation" or "animus" in response to speech does not support liability when the result is an arrest supported by probable cause. *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019). That's what happened to Frederickson. Gaps in his sequence of registrations led to a conviction. A state appellate court rejected his contention that the arrest was invalid or that his lack of registration was justified. *People v. Frederickson*, 2014 IL App (3d) 110733-U (June 3, 2014). Having litigated and lost in state court, Frederickson cannot obtain relief in federal court on a theory that

requires him to show that the law was "clearly established" in his favor. And if Frederickson can find a way around the holdings of *Nieves* (2019) and his own criminal conviction (2014), that would hardly help him to show that the law was clearly established his way in 2011. See *Reichle v. Howards*, 566 U.S. 658 (2012) (holding that as of 2012 qualified immunity blocks recovery on a retaliatory-arrest claim).

A second theory would be that Landeros violated the Fourth Amendment (again applied through the Fourteenth), if not the First Amendment, by allowing retaliatory animus to influence his registration decisions, which in turn led to custody. But once again probable cause for Frederickson's arrest defeats that theory. The Fourth Amendment applies objectively; the officer's state of mind is irrelevant. See, e.g., *Whren v. United States*, 517 U.S. 806 (1996). This means that "retaliatory arrest" claims under the Fourth Amendment are unavailing. *Hartman v. Moore*, 547 U.S. 250 (2006).

A third approach would invoke the Due Process Clause of the Fourteenth Amendment for the proposition that Landeros deprived him of a valuable procedure: the ability to move his registration from Joliet to Bolingbrook. That approach, however, runs into *Beley v. Chicago*, 901 F.3d 823 (7th Cir. 2018), which holds that the Due Process Clause does not create or protect a right to register as a sex offender. No one wants to be a registered sex offender; registration is a duty, not an opportunity. The right, we held in *Beley*, is not to be arrested and confined (or otherwise punished) for *failing* to register as a sex offender, when registration is required but improperly denied. And that takes us back to the first two potential approaches, which are blocked by *Nieves* and *Hartman*.

Could Frederickson benefit by recasting the due-process theory under the Equal Protection Clause? It's hard to see how. The fact remains that sex-offender registration is a detriment, not a benefit. The problem for a person who should have been registered but was not is the risk of prosecution, a risk that came to pass for Frederickson. Everything that *Beley* said about a due-process theory applies to an equal-protection theory as well. Surely the opposite was not "clearly established" in 2011.

My colleagues say that most of this analysis is irrelevant because Frederickson has abandoned any challenge to his arrest and confinement and is contesting only events that occurred before his arrest in March 2011. Slip op. 8. He also does not challenge his arrest in 2008. He does not contend that his custody following either arrest was unsupported by probable cause. But by abandoning any challenge to the arrests and custody, Frederickson also abandoned any plausible theory of damages, for lack of registration in Bolingbrook did not injure him. He was free to work or live there; his problem was the risk of arrest and prosecution to which non-registration exposed him. To repeat the holding of *Beley*: registration is a duty, not a right.

Both due-process and the equal-protection approaches come with an additional problem: the Fourteenth Amendment does not treat a violation of state law as a violation of the federal Constitution. See, e.g., *Snowden v. Hughes*, 321 U.S. 1, 11 (1944) (Equal Protection Clause); *Davis v. Scherer*, 468 U.S. 183, 192–96 (1984) (Due Process Clause); *Nordlinger v. Hahn*, 505 U.S. 1, 16 n.8 (1992) (Equal Protection Clause); *Archie v. Racine*, 847 F.2d 1211, 1215–18 (7th Cir. 1988) (en banc) (Due Process Clause); *Tucker v. Chicago*, 907 F.3d 487,

494–95 (7th Cir. 2018) (citing both due-process and equal-protection decisions). See also, e.g., *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (holding that, because a violation of state law cannot be equated to a violation of the Constitution, it is impermissible for a federal court to issue collateral relief for errors of state law) (collecting many other decisions).

Federal law does not specify where, within a state, a sex offender must register. The rule that Frederickson needed to register in Bolingbrook if he wanted to work in Bolingbrook (if that is indeed a rule) is one of Illinois law. Likewise any requirement that Landeros transfer Frederickson's LEADS file from Joliet to Bolingbrook is one of Illinois law. My colleagues make clear their view that Landeros did not follow his duties under Illinois law. But how is that a "clearly established" *constitutional* claim? If Illinois law provided that Frederickson, having registered in Joliet, must continue to do so, he would not have a federal objection. This shows that his claim arises under state law, not the Constitution. See *Wilson*, 562 U.S. at 6 (where "it would *not* violate federal law for [a state] to adopt a rule authorizing what the [state actor] did" there is no constitutional problem) (emphasis in original). Cf. *Gordon v. Degelmann*, 29 F.3d 295, 300 (7th Cir. 1994) ("[F]ederal courts assess constitutional claims by assuming that the state wants its employees to behave just as they did and asking whether federal rules permit the state to achieve this objective.").

My colleagues hint at one way to derive a constitutional violation from a violation of state law. The Equal Protection Clause requires official action to have a rational basis. Landeros has not asserted a rational basis for violating Illinois law. How *could* a public employee have a rational basis for

defying state law (if state law is not itself unconstitutional)? QED. By this approach every violation of state law becomes a violation of the Constitution. *Snowden* and its successors are defunct. Perhaps the Supreme Court will hold that some day (though I doubt it), but it assuredly was not the law in 2011. The sequence "violation of state law demonstrates absence of a rational basis which shows a violation of the Constitution" was not clearly established in 2011 and is not clearly established today.

This leaves a fifth theory, which my colleagues embrace: Frederickson was a class of one who did not receive equal treatment from Landeros. According to the majority, everyone has a "right to police protection uncorrupted by personal animus." Slip op. 2, 11, 12. And on *this* approach, all of the obstacles I have mentioned vanish. Want to avoid *Nieves*? Ignore the First Amendment and assert that the retaliatory arrest was a "class-of-one equal-protection" problem. Disagree with *Hartman*? Same solution. Seeking to sidestep *Beley*? Class-of-one is your silver bullet. Trouble showing that any of these legal propositions was clearly established in 2011? Just assert that everyone *always* has had a "right to police protection uncorrupted by personal animus."

I don't see how this magic can work. A class-of-one equal-protection claim is a subset of all equal-protection claims and therefore is subject to the rule that a violation of state law differs from a violation of the Constitution. I am confident that the Justices who decided *Nieves* and *Hartman* thought they were making substantive decisions about the circumstances under which public employees would be liable, rather than fiddling with the names attached to theories of liability. And it does not matter whether we treat Lande-

ros as (merely) not following state law or as making registration in Bolingbrook "unavailable" (slip op. 20); neither approach permits a violation of state law to serve as the foundation for a constitutional recovery. *Nieves* and *Hartman* show that there is no general rule that personal animus makes a public official's acts unconstitutional, if the acts have some other basis—whether it be probable cause to arrest (as in *Nieves* and *Hartman*) or state law. I am not saying that Landeros's acts *were* supported by Illinois law. (Landeros says they were; Frederickson says they weren't.) The point instead is that whether they were so supported is a question of state law only. Frederickson's remedy, if any, lies under Illinois law rather than §1983.

If it has always been the law that everyone has a "right to police protection uncorrupted by personal animus", why did the Supreme Court decide *Hartman* in 2006? Why did *Reichle* hold in 2012 that qualified immunity blocks recovery on a retaliatory-arrest claim? Why did we bother with *Del Marcelle v. Brown County*, 680 F.3d 887 (7th Cir. 2012) (en banc)? Del Marcelle alleged that, as a result of personal animus, local officials failed to protect him from criminals and so violated the Equal Protection Clause on a class-of-one theory. The court en banc rejected that claim, though by an equally divided vote. On the view taken by my colleagues today, Del Marcelle should have prevailed. He did not. A view that lost in 2012 cannot have been clearly established in 2011.

I explained in *Del Marcelle* that a class-of-one equal-protection theory is not an appropriate way to evaluate police officers' conduct. 680 F.3d at 902–05 (concurring opinion). It is not necessary to repeat that analysis, because the question is whether the right Frederickson asserts was clear-

ly established in 2011 rather than 2012 or today. But it is apt to ask why, if it has always been established that everyone has a "right to police protection uncorrupted by personal animus", that supposed right was still at issue in 2012—and why it is not possible to find support for it in the decisions of the Supreme Court. The debate within this court in 2012, and the lack of a good precedent in Frederickson's favor from the Supreme Court, bring into play the principle that "[i]f judges … disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999).

More than that. My colleagues' conclusion that the clearly established right is one "to police protection uncorrupted by personal animus" is at *far* too high a level of generality. The Supreme Court has held a right is "clearly established" only if it has been "defined with specificity." *Escondido*, 139 S. Ct. at 503. See also, e.g., *Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018); *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018); *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015); *San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015); *Carroll v. Carman*, 574 U.S. 13, 16–17 (2014); *Wood v. Moss*, 572 U.S. 744, 757–58 (2014); *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014); *Stanton v. Sims*, 571 U.S. 3, 5–6 (2013); *Brosseau v. Haugen*, 543 U.S. 194, 198–99 (2004). These decisions, and more, tell us that a high level of generality won't do.

A right has been defined "with specificity" when existing judicial decisions tell the officer what to do, concretely, in a given situation. See also, e.g., *Weiland v. Loomis*, 938 F.3d 917, 919–20 (7th Cir. 2019). The proposition that everyone is entitled to "police protection uncorrupted by personal animus"

does not convey that information. It does not tell Landeros when to transfer a LEADS file (state law does that). It does not tell any officer where a given sex offender must register, or when a sex offender under investigation in one jurisdiction (such as Joliet) is entitled to register in another (such as Bolingbrook). Official action uncorrupted by personal animus is an ideal—something to which all public employees should aspire—but not a rule of conduct governing day-to-day business. It is therefore not adequate as a foundation for damages under §1983.

Midway through their opinion, my colleagues allow that "police protection uncorrupted by personal animus" may be too general. Slip op. 11–12. They propose this variant: Frederickson and similar persons have a "right to register as a sex offender or to file complaints with the local authorities without being blocked by a police officer who acts exclusively out of animus." Slip op. 17. This supposes that sex offenders *have* a "right to register as a sex offender". Yet in 2018 *Beley* held that they do not. My colleagues say that *Beley* is limited to due-process claims. Suppose that is so. Still, where was it clearly established before March 2011 that the Equal Protection Clause creates a "right to register as a sex offender"? My colleagues do not cite any decision so holding. As for "file complaints without being blocked …", no one blocked Frederickson from filing complaints. He could have filed a complaint about Landeros at Joliet's police department but did not try to. He could have sued Landeros and asked a state judge to direct Landeros to let him register in Bolingbrook, but he didn't. There is a constitutional right of access to the courts, *Bounds v. Smith*, 430 U.S. 817 (1977), but Landeros did not interfere with it. Frederickson alleges not that Landeros obstructed a complaint process but that Lan-

deros blocked him from registering in Bolingbrook (as opposed to Joliet). The final part of this formulation—"by a police officer who acts exclusively out of animus" might be rephrased as "by a police officer who violates state law exclusively out of animus", but violating state law differs from violating the Constitution, and at all events a prohibition against "acting out of animus" simpliciter is not a clearly established federal right. It conflicts with *Nieves* and *Hartman* while posing the same generality problem as a right to "police protection uncorrupted by personal animus".